504 A.2d 1132

## AMALGAMATED TRANSIT UNION, DIVISION 1300

v.

## MASS TRANSIT ADMINISTRATION.

**No. 37, Sept. Term, 1985.**

Court of Appeals of Maryland.

Feb. 25, 1986.
Motion for Reconsideration Denied April 2, 1986.

Joel A. Smith (Bernard W. Rubenstein, Patty L. Parsons and Abato, Rubenstein & Abato, P.A., on brief), Lutherville, for appellant.

Joseph S. Kaufman (Kenneth D. Pack and Melnicove, Kaufman, Weiner & Smouse, P.A., on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

RODOWSKY, Judge.

This appeal grows out of a labor arbitrator's award in review of a discharge from employment. The arbitrator found that a Mass Transit Administration (MTA) bus driver, who had previously been warned not to do so, had operated a bus with the odor of alcohol on his breath, without being intoxicated or under the influence. The award ordered reinstatement but denied backpay or benefits, thereby in effect imposing a suspension for eight months and nineteen days. MTA contends that Maryland public policy requires discharge and tolerates no lesser sanction. While public

policy would require discharge for drunken driving of a public bus, the findings by the arbitrator preclude treating this case as one of drunken driving. Here the facts do not permit judicial intrusion into this dispute which, under the parties' labor relations, is to be resolved exclusively by the arbitrator chosen by them.

## I

That which MTA submits to be a pure legal issue is best understood if we interweave the events giving rise to the specific grievance involved here with the past practices between management and labor at MTA concerning drinking as it affects an employee's work-related duties.

MTA's applicable rule of conduct is described in an affidavit filed in the trial court by MTA's Resident Manager. He explained

> [t]hat throughout the Mass Transit industry, as well as in Baltimore, a "cardinal sin" is the consumption or abuse of alcohol while an operator is on duty. The violation of this prohibition poses a danger to the public—MTA passengers and other vehicles and pedestrians with which the bus shares the road; to property of the MTA and others; to the driver himself; and to the image of the MTA. Any appearance of alcohol consumption, whether by odor, appearance, or demeanor, on the part of an operator, will undermine seriously the confidence of the public in that operator and in the MTA itself.

This reflects that MTA distinguishes between misconduct by way of alcohol consumption or abuse while on duty and misconduct by way of a driver's having the odor of alcohol on his breath while on duty.

About 10:00 a.m. on November 26, 1983, Andrew Smith, a bus operator for MTA, was involved in an accident. While his bus was stopped a truck hit his vehicle's left, rearview mirror making it unuseable. Smith called the dispatcher to report the accident. A short time later a supervisor arrived at the scene in response to this call. The supervisor detect-

ed the smell of alcohol on Smith's breath. He summoned a second supervisor to the scene who also smelled alcohol on Smith's breath. Smith was relieved from duty and taken to an office of MTA. There he was placed in the charge of an officer of the MTA police. The officer offered to administer a breathalyzer test. On advice of a union steward Smith refused to take the test.

Under the parties' practices when a supervisor suspects that an operator is in violation of MTA rules concerning alcohol, the supervisor may ask the operator for specific consent to a breathalyzer test. The fact of employment does not carry with it any general consent to such testing, and management cannot compel submission to such a test. An employee has the right to consult with a representative of the union before deciding whether to consent. If the employee refuses to take a breathalyzer test, the refusal may not be used to incriminate the employee. MTA also conducts an alcoholism rehabilitation program for operators. An operator's participation in this program is confidential.

How the parties got into the posture described above is not fully explained in the record. It is clear, however, that in disciplinary cases involving alcohol consumption, MTA management witnesses are limited, absent the employee's having consented to a breathalyzer test, to descriptions of external indicia of alcohol consumption. At MTA both management and labor call this the "Sniffer's Test."

When Smith would not consent to a breathalyzer test, a supervisor interviewed him. That interview resulted in a disciplinary report stating that Smith was " 'suspected of being under the influence of alcohol [and] refused breathalyzer.' " On December 8, 1983, after a hearing before a superintendent, MTA discharged Smith.[1] There was a further management review by MTA's Manager-Divisions. In

---

1. Any findings which might have been made at the superintendent's hearing are not in the record before us.

a February 27, 1984 letter to the president of the union, advising of the disposition on that review, MTA said Smith "was discharged for operating under the influence of alcohol." That letter explained that "[g]iven the absence of the results of the breathalyzer, the available evidence of the five witnesses who testified that they smelled alcohol ('Sniffer's Test') must prevail." The Manager-Divisions, after stating that Smith had "totally ignored" a warning, upheld the discharge.

Under the collective bargaining agreement with the union, "MTA agree[d] that discharge will be for just cause." MTA and the union further agreed to arbitrate any unsettled grievance and that the decision of the arbitrator "shall be final and binding upon [them]."[2]

Smith's grievance moved on to arbitration. The record before us of the arbitration proceedings contains only certain opinions rendered in earlier arbitrations and the opinion of the arbitrator in this case. If the parties ever agreed on issues which were presented in writing to the arbitrator, as contemplated by their collective bargaining agreement, we do not have those issues. Of necessity, the arbitrated issue was whether there was just cause for Smith's discharge. In light of the justification given at the highest level of review by MTA management for discharging Smith, the arbitrator's opinion states the basic issue to be "if Mr. Smith was driving an MTA vehicle while under the influence of alcohol on the morning of November 26, 1983." MTA argued before the arbitrator that public policy justified discharge.

---

2. Md.Code (1977, 1985 Cum.Supp.), §§ 7–201 to –706 of the Transportation Article create MTA and provide for its functions. Section 7–601 authorizes it to "deal with and make written contracts as to wages, salaries, hours, working conditions, and pension and retirement provisions with the accredited representatives of the employees who form part of any operating company that the Administration acquires, including the representative of any labor organization authorized to act for those employees." Arbitration is authorized by § 7–602.

In his opinion the arbitrator summarized and weighed Sniffer's Test evidence given by five witnesses called by MTA before making the following findings of fact.

I believe that Mr. Smith had the smell of alcohol on his breath on November 26, 1983. Mr. Smith admitted that he had three glasses of wine the previous evening. All five Authority witnesses smelled alcohol on Mr. Smith's breath, with four of them judging the smell to be "strong" or "very strong."

\* \* \* \* \* \*

The Authority is properly concerned with ensuring the safety of its passengers, employees, and equipment. No one disputes that an operator driving under the influence of alcohol constitutes a danger that cannot be tolerated. An operator with the smell of alcohol on his breath becomes an object of suspicion. When that operator has a prior record of alcoholism, the suspicion naturally increases. Suspicion is not tantamount to proof, however, and a past record cannot be used to establish guilt. I have no doubt that Mr. Smith had a distinct smell of alcohol on his breath on November 26, 1983. I am not persuaded that he was driving under the influence of alcohol.

Mr. Smith's past record, including the clear warnings of Arbitrator Sickles and his base manager in August 1983, should have made him aware that any future involvement with alcohol could lead to grave consequences. For whatever reason, Mr. Smith did not heed that warning. While the Authority's case in this matter does not justify termination for being under the influence of alcohol, it is sufficient for a suspension for Mr. Smith's involvement with alcohol on November 26, 1983.

The reference to Smith's having been warned is to an earlier arbitration. That arbitration arose out of a May 1982 accident in which Smith had been involved on his own time with his own vehicle. On July 14, 1982, the Motor Vehicle Administration (MVA) suspended Smith's driver's

license for 90 days because he had refused to submit to a breathalyzer test following that accident. Smith applied to MTA for a leave of absence for 90 days pursuant to a provision of the collective bargaining agreement, but MTA refused the leave of absence and discharged him. On August 20, 1982, MVA again suspended Smith's license for 90 days, to run concurrently with the prior suspension, for driving under the influence on the occasion of the May 1982 accident. In an opinion of May 19, 1983, an arbitrator (Sickles) held that the collective bargaining agreement obligated MTA to have granted Smith a leave of absence and that an exception from that obligation, relating to license suspension for driving while intoxicated and on which MTA had relied, did not apply to Smith's suspension for refusing the blood alcohol test. The award ordered reinstatement with full backpay and benefits. That arbitrator warned Smith that "any repetition of an alcohol-related incident should be dealt with harshly and swiftly by this Employer."[3]

The arbitrator in the present case took the prior warning into account. He also looked to the common law of the parties' labor relations as reflected in prior arbitration opinions. He believed that a precedent involving an operator named Tucker was factually the most similar to Smith's misconduct. Tucker's work record, however, had been good and Smith's was not. Tucker had received a one-week suspension. This arbitrator suspended Smith for the entire

---

3. The full text of that arbitrator's warning is set forth below:
    It is unconscionable to the undersigned to order a backpay in this regard because of the inter-relationship of the offenses and the Company's sensitivity to maintaining in its employ an individual who has exhibited difficulties with alcoholic beverages when that individual is engaged in transporting the public. Accordingly, I will restore the grievant to service, but without backpay and with the strongest possible admonition to him that reasonable minds could very easily differ in this case inasmuch as it is not free from all doubt and that any repetition of an alcohol-related incident should be dealt with harshly and swiftly by this Employer.

eight months and nineteen days which had expired from Smith's discharge to the date of the award.

MTA refused to reinstate Smith, and the union filed a complaint in the Circuit Court for Baltimore City seeking specific performance of the award. MTA counterclaimed for declaratory and injunctive relief, asserting that the award was void and unenforceable. On cross-motions for summary judgment the trial judge decreed "that enforcement of the arbitration decision in this action would violate the public policy of this State and, therefore, cannot be enforced...." He concluded his opinion by stating:

> In addition to violating public policy, if the arbitration award is enforced, the MTA faces liability under the doctrines of agency or negligent entrustment for any future alcohol-related accidents caused by Mr. Smith in the course of his employment. In light of the MTA's responsibility to the public, it cannot permit itself to be bound to this arbitration decision.
>
> The public policy of preventing people from drinking and driving is embodied in the case law and applicable statutes of this State. The policy is well defined and particularly strong with regard to public transportation drivers. To enforce the arbitrator's award in this case, an award which compels the reinstatement to driving duties of a bus driver who consumed alcohol during or prior to work, and who has had numerous prior work related alcohol incidents, would certainly violate this public policy.[4]

The union appealed to the Court of Special Appeals. We granted MTA's petition for a writ of certiorari prior to the hearing of the case in the intermediate appellate court.

---

**4.** The record does not contain Smith's driving record, presumably because MTA, instead of proving Smith's record, tried to prove that on a particular day he had been operating a bus while under the influence of alcohol.

## II

Where, as here, a party to a labor arbitration seeks judicial intervention into that dispute resolution process, the approach ordinarily to be taken by the court is as set forth by Judge, now Justice, Marshall for the Second Circuit in *Local 453, International Union of Electrical Workers v. Otis Elevator Co.,* 314 F.2d 25, *cert. denied,* 373 U.S. 949, 83 S.Ct. 1680, 10 L.Ed.2d 705 (1963). There an employee had been discharged for writing numbers on company premises. An arbitrator reinstated the employee without backpay or accrual of seniority or benefits after seven months. Trial courts had refused to enforce the reinstatement award, but the Second Circuit reversed, saying:

Having bargained for the decision of the arbitrator on the question of whether Calise's conduct and criminal conviction constituted "just cause" for discharge, the parties are bound by it, even if it be regarded as unwise or wrong on the merits; "so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 [, 1429] (1960). To separate the just causes for discharge from the injust was precisely what the parties clothed the arbitrator with the authority to do. If the employer wanted the automatic right to discharge an employee for violation of certain company rules or for the commission of certain crimes, whether on or off the company premises, it had the opportunity to seek such an explicit exclusion from the general arbitration clause when the collective agreement was negotiated, as it may do when the collective agreement expires. In the absence of such a clause, the decision of the arbitrator in the present case must be taken as conclusively establishing as a matter of contract interpretation that the discharge of Calise was not for just cause and as foreclosing judicial review of the merits of the question. [314 F.2d at 28.]

■ There is, however, a public policy exception. As with any contract, "a court may not enforce a collective bargaining agreement that is contrary to public policy." *W.R. Grace & Co. v. Local Union 759, International Union of the United Rubber Workers,* 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298, 307 (1983). But the public policy which obliges a court to refrain from enforcing a collective bargaining agreement must be "explicit." It "must be well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Id.* (quoting *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744, 756 (1945)).

■ In considering MTA's public policy argument we are obliged to take the facts as found by the arbitrator. With certain exceptions not relevant here, *e.g.,* fraud, a court will not review the findings of facts of arbitrators. *See Chillum-Adelphi Volunteer Fire Department, Inc. v. Button & Goode, Inc.,* 242 Md. 509, 516, 219 A.2d 801, 806 (1966). *See also Mayor and City Council of Baltimore v. Allied Contractors, Inc.,* 236 Md. 534, 546, 204 A.2d 546, 552 (1964); *Schreiber v. Pacific Coast Fire Insurance Co.,* 195 Md. 639, 646–47, 75 A.2d 108, 112 (1950); *McDonald v. Real Estate Board,* 155 Md. 377, 382–83, 142 A. 261, 263 (1928); *Dominion Marble Co. v. Morrow,* 130 Md. 255, 260, 100 A. 292, 293 (1917).[5]

---

**5.** The Uniform Arbitration Act is in force in Maryland, being found in Md.Code (1974, 1984 Repl.Vol.), §§ 3–201 to –234 of the Courts and Judicial Proceedings Article. The Maryland version differs from the uniform act as promulgated by the presence in § 3–206(b) of a provision stating that it "does not apply to an arbitration agreement between employers and employees or between their respective representatives unless it is expressly provided in the agreement that [it] shall apply." Neither party to the instant case claims that the Maryland Uniform Arbitration Act is directly applicable. Under Maryland Rule E2, in cases where the Maryland Uniform Arbitration Act is not applicable, court proceedings are to follow the procedures outlined in the Act.

In the case before us the arbitrator found that Smith had the odor of alcohol on his breath while on duty; but the arbitrator also found that Smith was not operating the bus while under the influence of alcohol. Consequently, for MTA to prevail it must demonstrate that Maryland public policy compels the discharge of a public bus operator for having the odor of alcohol on his breath, although the operator is not under the influence of alcohol. Phrased another way, the position which MTA must take is that on the instant facts public policy gives no discretion to the arbitrator in fashioning an appropriate sanction even when the arbitrator finds a lack of just cause for discharge. MTA argues that the public policy here is so unyielding that it must be satisfied exclusively by economic capital punishment and cannot be satisfied by a suspension of more than eight months.

█ We hold that the Maryland public policy against drunk driving is not so extreme. This is reflected (A) by prior arbitrations between MTA or its predecessors and the union representing bus operators in Sniffer's Test cases, (B) by the factual inapplicability to the instant matter of the cases relied upon by MTA, and (C), of particular significance, by the Maryland statutes.

### A

Prior decisions in arbitrations between the parties illustrate (1) the degree of the alcohol-related misconduct specifically charged in justification of a discharge, (2) the difficulties of proof which management has faced when its case rested on the Sniffer's Test, and (3) the broad discretion which an arbitrator has in fashioning a sanction appropriate to the facts as found by the arbitrator.

In a 1984 case an MTA employee had been discharged for operating a bus while under the influence of alcohol. A passenger had by telephone complained to MTA that the driver of a given bus appeared to have been drinking. When supervisors investigated they could not smell any

odor of alcohol on the driver's breath. The latter consented to a breathalyzer test and "blew" a .11%. The arbitrator sustained the discharge.

An operator named Tucker had been discharged in 1962 on the ground that he was driving a bus when his "judgment and ability to operate a bus were impaired due to the use of alcohol either after reporting for work or immediately before reporting for work." Based on Sniffer testimony the arbitrator found that "there was a perceptible odor of alcohol on Tucker's breath," but that the "facts do not indicate a man whose judgment has been impaired by the recent use of alcohol." The arbitrator in effect found there was just cause for a one-week suspension by awarding reinstatement with backpay, except for one week.

Management discharged an operator in 1960 for driving a bus "in a state of intoxication to the point of unfitness safely and properly to operate a bus." Proof seems to have rested exclusively on the Sniffer's Test. The arbitrator found that the odor of alcohol on the operator's breath was so faint that it must be taken as residual in character. The award ordered reinstatement without loss of any pay or benefits.

The bus driven by the grievant in a 1959 arbitration had collided with the safety gate at a grade crossing. Based on external appearances management discharged the driver for operating a company bus in an intoxicated condition. The arbitrator found the supervisors' testimony to be reliable and concluded that the driver "was indisputedly *not* in command of his normal faculties." (Emphasis in original). The discharge was sustained.

In a 1957 arbitration the bus operator admitted to having drunk at least one beer not long prior to the beginning of the second part of his tour of duty, and the arbitrator found that the operator may "have smelled somewhat of beer" while on duty. This was held not to constitute just cause for discharge. The operator was reinstated but awarded only one-half of his backpay.

In light of the foregoing review and of the Resident Manager's affidavit, it seems fair to summarize that historically MTA has considered that it must prove driving under the influence or consumption of alcohol while on duty in order to sustain a discharge for misconduct involving alcohol. When management's case rests on the Sniffer's Test, the arbitrator sometimes finds the quality of the particular proof sufficient to establish operating under the influence of alcohol and sustains the discharge. Sometimes the arbitrator finds the proof insufficient. This history is inconsistent with the existence of a public policy which mandates the discharge, and nothing less, of any public bus driver who bears the odor of alcohol while on duty.[6]

## B

There are two federal court decisions which deal with the public policy against driving under the influence of alcohol, but neither decision is on point. *NLRB v. Dixie Motor Coach Corp.*, 128 F.2d 201 (5th Cir.1942) is an unfair labor practice case in which the employer defended against a charge of dismissal for union activity by demonstrating that the discharge was for misconduct involving alcohol. The employee, Richards, was a bus driver for a company which was subject to the rules and regulations of the Railroad Commission of Texas. Those regulations forbade "the operation of any motor bus by an operator who drinks intoxicating liquor either on or off duty." *Id.* at 203. The employer said Richards was discharged for "his continued use of intoxicating liquor after repeated cautionings...." "[A]ccording to the testimony of six disinterested witnesses, Richards appeared repeatedly along the route taken by his bus in an intoxicated condition." *Id.* Some of the witnesses testified that Richards "frequently became intoxicated,

---

6. Another way to look at MTA's argument is that this Court is being asked, in the guise of articulating public policy, to fill the void created by the absence of a right in MTA management to compel submission to a breathalyzer test as a follow-up to a positive Sniffer's Test.

and that on occasions he drove his bus on his regular run before he had fully recovered from a drinking spree." *Id.* The second decision, *Amalgamated Meat Cutters v. Great Western Food Co.*, 712 F.2d 122 (5th Cir.1983), refused on public policy grounds to enforce a reinstatement. While en route from Fort Worth, Texas to California, the employee overturned the eighteen-wheel tractor-trailer rig he was driving. An Arizona Highway Patrol officer who arrived at the scene noted a strong smell of liquor on the driver's breath. The driver admitted to the officer that the former had taken a drink at his last rest stop. The officer charged the driver under a Federal Motor Carrier Safety regulation which prohibits drinking intoxicating liquor while on duty or within four hours prior thereto. In the case before us there is no rule which requires an MTA operator to abstain from drinking intoxicating liquor at all times, both off duty as well as on duty, and there is no finding that Smith was drinking on duty.

## C

When we look to enactments of the General Assembly to test MTA's contention, we find that the statutes relating to chemical tests for intoxication are contrary to the rigid position urged by MTA. Under Md.Code (1977, 1984 Repl. Vol.), § 16–205.1 of the Transportation Article a police officer may, under the various circumstances therein described, request or require an individual to take a chemical test for alcohol if the officer has reasonable grounds to believe that the individual is or has been driving or attempting to drive a motor vehicle while intoxicated or under the influence of alcohol. A sufficiently strong odor of alcohol on the motorist's breath can furnish reasonable grounds. If the blood alcohol test finding is .05% or less, the presumption is that the motorist was not intoxicated and was not driving while under the influence of alcohol. If the test finding is more than .05% but less than .08%, there is no presumption for or against the motorist. *See* Md.Code (1974, 1984 Repl.Vol.), § 10–307(b) and (c) of the Courts and

Judicial Proceedings Article. Maryland public policy cannot mandate discharge, and nothing less, as the sanction for a bus driver having alcohol on his breath when the General Assembly has recognized that the odor of alcohol on one's breath can be consistent with a presumption of innocence of any motor vehicle violation involving alcohol consumption.

A further contradiction in MTA's "public policy" argument is that it apparently causes MTA's alcoholism rehabilitation program to violate public policy. If any and all operators who have ever been found at work with alcohol on their breaths must be discharged, there would be no former problem drinkers at MTA to participate in the program.

Any given Sniffer's Test case requires an evaluation of all of the evidence, including testimony of alcohol odor, a determination of the seriousness of the misconduct, if any, a weighing of the employee's past record, and a review of any warnings from the employer. With such a variety of possible factors bearing on alleged alcohol-related misconduct there can be no "explicit" and "well-defined" public policy which is as inflexible as MTA asserts. *W.R. Grace & Co. v. Local Union 759, International Union of the United Rubber Workers, supra.* The result will depend on the facts and their evaluation in each case. That job is exclusively for the arbitrator.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE, MASS TRANSIT ADMINISTRATION.

SMITH, Judge, dissenting.

I submit that the arbitrator and the majority here have erred in concluding that it was necessary to prove that Smith operated the bus while under the influence of alcohol in order to discharge him. In my view it would be sufficient grounds for discharge if Smith consumed alcoholic

beverages while on duty or just prior to going on duty. The undisputed presence of a strong odor of alcohol on Smith's breath supports a rational inference that one or the other was the case here.

The majority opinion refers to *National Labor R. Board v. Dixie Motor Coach Corp.*, 128 F.2d 201 (5th Cir.1942). I find it of interest that the court there said:

"The public interest, as well as that of the employer, requires of any one entrusted with the lives and safety of the travelling public that he conduct himself in a manner in keeping with his responsibilities." 128 F.2d at 203.

It likewise is of interest that the Federal Motor Carrier Safety regulation mentioned by the majority in connection with *Amalgamated Meat Cutters v. Great Western Food Co.*, 712 F.2d 122 (5th Cir.1983), prohibits drinking intoxicating liquor while on duty or within four hours prior thereto. I deem what the court said there as relevant here:

"In a nation where motorists practically live on the highways, no citation of authority is required to establish that an arbitration award ordering a company to reinstate an over-the-road truck driver caught drinking liquor on duty violates public policy. Alcohol impairs a person's coordination, and inhibits his ability to reason rationally. Ingestion of alcohol slows the reflexes. It induces drowsiness. It slows response time to external stimuli. It dulls the senses. In recognition of alcohol's undisputedly debilitating characteristics, every state in the union prohibits driving while under its influence. A driver who imbibes the spirits endangers not only his own life, but the health and safety of all other drivers. These considerations are convincing enough with respect to drivers of automobiles. They become even more compelling when the driver is regularly employed to course the highways in a massive tractor-trailer rig." 712 F.2d at 124.

I would hold it against public policy to require an employer such as MTA to establish that a driver had actually operated his transit vehicle under the influence of alcohol

before it could discharge him for drinking. Accordingly, I would affirm.

I am authorized to state that Judges ELDRIDGE and COUCH concur in the views here expressed.