309 Md. 85 (1987)
522 A.2d 931
BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY
v.
PRINCE GEORGE'S COUNTY EDUCATORS' ASSOCIATION, INC.
No. 55 September Term, 1985.
Court of Appeals of Maryland.
March 26, 1987.
Paul M. Nussbaum (Sheldon L. Gnatt, on the brief), Greenbelt, for appellant.
Susan W. Russell (Walter S. Levin and Weinberg & Green, on the brief), Baltimore, for appellee.
Argued before MURPHY, C.J., and SMITH,[*] ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.
ELDRIDGE, Judge.
This case concerns the standard of review applicable to judicial consideration of a petition to vacate a public-sector labor arbitration award under Maryland Code (1978, 1985 Repl.Vol.), § 6-408 of the Education Article. The issue in this case is whether the circuit court erred in refusing to vacate the arbitration award.

I.
Prince George's County Educators' Association is the exclusive bargaining representative for certificated teachers in the Prince George's County public school system. In September 1981, the Association and the Prince George's County Board of Education entered into a collective bargaining agreement effective from August 1, 1981, until August 31, 1983, which established wages, hours, and working conditions for all certificated professional employees of the Board. The agreement set forth a grievance procedure, culminating in arbitration. The agreement was authorized by § 6-408(a) of the Education Article of the Code.
In 1982, the Association filed a formal grievance over a dispute with the Board involving the driver education program. The Association alleged that changes in the driver education program pursuant to a Board resolution violated the collective bargaining agreement then in effect by unilaterally reducing the rank and pay of driver education teachers without cause.
The facts giving rise to the grievance can be summarized as follows. Prior to the 1979-1980 school year, § 7-412 of the Education Article required each county board of education to offer driver education instruction. Accordingly, the Prince George's County Board of Education offered driver education during the regular school day, in the evenings during the school year, and in the summer. The program was free for students of the Prince George's County school system; non-students were required to pay a fee. The Board received payment from the State Department of Transportation for each student who completed the course. See Code (1977), § 16-508 of the Transportation Article.
For regular school day instruction, driver education teachers were paid according to a wage scale that was negotiated between the Board and the Association as part of the collective bargaining agreement. This wage scale, applicable to all teachers, made no distinctions based on subject matter taught. The collective bargaining agreement provided that all teachers engaged in after-school teaching were to be paid at an hourly rate of 1/1500 of their regular annual salary while adult education teachers were to be paid at a flat hourly rate. Since 1974, driver education teachers have been part of the after-school program and paid accordingly.[1] All summer school teachers, including driver education teachers, were also paid at an hourly rate of 1/1500 of their regular annual salary. The collective bargaining agreements between the parties have never isolated driver education teachers as a specific category of personnel insofar as salary schedules are concerned. The salary schedules distinguish only between regular school day, after-school, adult education and summer instruction.
In 1979 the Maryland General Assembly amended § 7-412(a) of the Education Article to permit, but no longer require, county boards of education to offer driver education instruction. Fiscal considerations prompted the Prince George's County Board of Education to pass a resolution in April 1982 eliminating driver education from its regular high school curriculum. In order to meet the demand for driver education, however, the Board resolved to establish a "Driver Education School to be operated separate and apart from all other programs of instruction mandated by law...." The Driver Education School was authorized to provide instruction when school was not in session, i.e., after school and during the summer. The resolution provided that the Driver Education School was "to be funded strictly from tuition charged to the students enrolling therein and the monies received through the Driver Education Account of the Transportation Trust Fund pursuant to the provisions of Md. Ann. Code, Transportation Article § 16-508(b)." The Board resolved that the Driver Education School was "a separate and distinct educational component of the Board...." The driver education program under this new system became operational in the summer of 1982.
At the same time the Board also established a new pay rate for driver education teachers that was significantly less than the hourly rate of 1/1500 of the regular annual salary which had previously been paid. The new rates were $8.50 per hour for "laboratory" and behind-the-wheel instruction and $12.50 per hour for classroom instruction.
Several driver education teachers filed a grievance, which the Association ultimately took to arbitration. The grievance requested that the Board return the driver education teachers to their previous rate of pay. An arbitrator from the American Arbitration Association denied the grievance in an opinion and award dated April 30, 1983.
The arbitrator found that the Board's practice since 1974 of paying driver education teachers at the hourly rate of 1/1500 of their regular salary "was a fixed practice consistently followed and became a part of the parties' Agreement, notwithstanding the failure to specifically incorporate that condition of employment in the written collective bargaining agreement." The arbitrator further found, however, that "the Driver Education School was a separate entity from the Board of Education because it had its own budget and its own structure and the intent of the [Board] ... was to establish a separate entity." Additionally, the arbitrator found that the Driver Education School "performed the same functions, in the same manner, at essentially the same locations, with the same overall supervisor, and with a majority of the same employees" as the old program. The arbitrator applied the "successorship doctrine," a principle of labor law, to hold that the Driver Education School was not bound by the terms of the collective bargaining agreement between the Association and the Board. See NLRB v. Burns International Security Services, Inc., 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). Therefore, according to the arbitrator, the Driver Education School could rightfully establish different compensation for the teachers which it hired.
The Association filed a petition in the Circuit Court for Prince George's County, "pursuant to Section 3-201 et seq., Cts. & Jud.Proc. Article of the Annotated Code of Maryland (1980), commonly known as the Maryland Uniform Arbitration Act, and pursuant to Maryland Rule E 2." The Association sought to vacate the arbitration award, asserting that "the Opinion and Award of the Arbitrator is completely irrational and, as such, exceeds the Arbitrator's power and was procured by undue means." Both sides filed motions for summary judgment. In the accompanying memoranda, each side took the position that the standards set forth in the Maryland Uniform Arbitration Act, Code (1974, 1984 Repl.Vol.), § 3-224 of the Courts and Judicial Proceedings Article, controlled and furnished the substantive grounds for vacating the arbitration award. Section 3-224 provides in relevant part as follows:
"(b) Grounds.  The court shall vacate an award if:
(1) An award was procured by corruption, fraud, or other undue means;
(2) There was evident partiality by an arbitrator appointed as a neutral, corruption in any arbitrator, or misconduct prejudicing the rights of any party;
(3) The arbitrators exceeded their powers;
(4) The arbitrators refused to postpone the hearing upon sufficient cause being shown for the postponement, refused to hear evidence material to the controversy, or otherwise so conducted the hearing, contrary to the provisions of § 3-213, as to prejudice substantially the rights of a party; or
(5) There was no arbitration agreement as described in § 3-206, the issue was not adversely determined in proceedings under § 3-208, and the party did not participate in the arbitration hearing without raising the objection.
(c) When award not to be vacated.  The court shall not vacate the award or refuse to confirm the award on the ground that a court of law or equity could not or would not grant the same relief."
The Association maintained that the arbitrator's finding that the Driver Education School was a separate entity from the Board was a "gross mistake," that the Board was the "sole employer," and that the decision was "completely irrational." The Association asserted that subsections (b)(1) and (b)(3) of § 3-224, relating to awards procured by undue means and awards in excess of the arbitrator's powers, authorized the circuit court to vacate the award.
After a hearing, the circuit court rendered an oral opinion holding that the award was not procured by "undue means" and that the arbitrator did not exceed his powers in concluding that the Driver Education School "was an independent organization, and that the then Driver Education instructors were under the employ of the successor employer." Thereafter, judgment was entered granting the Board's motion for summary judgment.
Upon the Association's appeal, the Court of Special Appeals reversed, deciding that the award should have been vacated. P.G. Co. Educators' Ass'n v. Bd. of Educ., 61 Md. App. 249, 486 A.2d 228 (1985). Like the parties and the circuit court, the Court of Special Appeals took the position that § 3-224(b) of the Maryland Uniform Arbitration Act controlled and delineated the grounds for vacating this award. 61 Md. App. at 253, 486 A.2d 228. The appellate court referred to its earlier opinion in O-S Corp. v. Samuel A. Kroll, Inc., 29 Md. App. 406, 348 A.2d 870 (1975), cert. denied, 277 Md. 740 (1976), as establishing the principle that an arbitration award which is "completely irrational" is in excess of the arbitrator's powers within the meaning of § 3-224(b)(3) and is procured by "undue means" within the meaning of § 3-224(b)(1). See 61 Md. App. at 253-254, 486 A.2d 228. The Court of Special Appeals in the instant case went onto hold "that the `complete irrationality' standard [of Kroll] is flexible enough to allow reversal of an arbitrator's decision where, as here, the arbitrator draws erroneous factual conclusions which form the sole basis for his award." Id. at 255, 486 A.2d 228.[2] The Court of Special Appeals went on to explain why the award was "completely irrational" (id. at 256-257, 486 A.2d 228):
"In the present case, the Driver Education School was not a separate entity from the Board of Education. Rather, as termed by the Board of Education in its own resolution creating the Driver Education School, the School was merely a `separate educational component of the Board of Education' (emphasis supplied). The arbitrator found that the Driver Education School was an entity so divorced from the Board of Education that the collective bargaining agreement between PGCEA and the Board of Education was not applicable. This finding, which was the sole basis for the arbitrator's award, is clearly erroneous and makes that award completely irrational.
* * * * * *
The record ... reflects ... that it was the Board of Education that hired and paid the Coordinator of the Driver Education School and the teachers who taught in the driver education program. In fact, under Maryland law, only the county boards of education have the authority to appoint teachers and set their salaries. Md.Educ. Code Ann. § 4-103(a) (1978). It was the Board of Education that had final control over the program and rules and regulations for the Driver Education School. It was the Board of Education's materials and facilities, such as textbooks, manuals, classrooms, and laboratories, that were utilized for the Driver Education School. It was the Board of Education's insurance that covered the employees of the Driver Education School. Finally, it was the Board of Education that was reimbursed by the State Department of Education for the students who successfully completed the program. The arbitrator recognized that the Driver Education School `performed the same function, in the same manner, at essentially the same locations, with the same overall supervision and with a majority of the same employees' as had existed when driver education was conducted under the previous program, but nevertheless concluded that the Driver Education School was a separate entity from the Board of Education. This conclusion is clearly erroneous. Because an erroneous factual conclusion forms the sole basis for the arbitrator's award, that award cannot be upheld. If an employer could avoid a collective bargaining agreement merely by modifying the method of administering its business in as slight a manner as the Board of Education has with the Driver Education School, collective bargaining agreements would be rendered meaningless."
We then granted the Board's petition for a writ of certiorari which presented the broad general question of whether the Court of Special Appeals erred in holding that the award should be vacated. In this Court, both sides have again taken the position that § 3-224(b) of the Uniform Arbitration Act controls this case. Furthermore, both sides agree that the "complete irrationality" standard adopted by the Court of Special Appeals is appropriate, and that an award which is "completely irrational" is in excess of the arbitrator's authority within the meaning of § 3-224(b)(3) and is procured by "undue means" within the meaning of § 3-224(b)(1). The only dispute between the Board and the Association is whether or not the award in the instant case was "completely irrational" in light of the essentially undisputed facts, Maryland education law, and principles of labor law.

II.
In our view, a threshold issue in this case is whether the statutory grounds for vacating an arbitration award, set forth in § 3-224(b) of the Maryland Uniform Arbitration Act, are applicable or whether this award is to be reviewed in accordance with non-statutory Maryland common law standards.
We shall assume arguendo that the Maryland Uniform Arbitration Act was generally intended to be applicable to statutorily authorized arbitration awards under contracts entered into by state government agencies.[3] Nevertheless, the Uniform Arbitration Act itself, in § 3-206(b) of the Courts and Judicial Proceedings Article, specifically provides that the Act "does not apply to an arbitration agreement between employers and employees or between their respective representatives unless it is expressly provided in the agreement that this subtitle shall apply." See Wilson v. McGrow, Pridgeon & Co, P.A., 298 Md. 66, 467 A.2d 1025 (1983), discussing the history and scope of this exception for arbitration provisions in collective bargaining agreements. The agreement in the present case did not expressly provide that the Maryland Uniform Arbitration Act should apply. The agreement made no reference, in any manner, to that statute. Therefore § 3-206(b) renders the Maryland Uniform Arbitration Act inapplicable here. See Amalgamated Transit Union v. MTA, 305 Md. 380, 389 n. 5, 504 A.2d 1132 (1986).
The Association, in its circuit court petition to vacate the arbitration award, also referred to Maryland Rule E2. That rule states as follows:
"After a final award has been made in writing in an arbitration to which the Maryland Uniform Arbitration Act is inapplicable, court proceedings may be had to confirm, vacate, modify, correct, or enter judgment on the award. In any such case, the provisions of the Maryland Uniform Arbitration Act concerning such proceedings shall be applicable."
Literally the above-quoted language could be read as making the entire Maryland Uniform Arbitration Act applicable in a court proceeding after the rendition of an award in an arbitration to which the Act is not applicable, including the substantive grounds for vacating an award set forth in § 3-224(b) of the Act. This broad construction of Rule E2, however, would be inappropriate.
First, a broad construction of Rule E2 would largely render nugatory an exception to the applicability of the Maryland Uniform Arbitration Act like that set forth in § 3-206(b). This would violate the settled principle that constructions which render statutory language meaningless should be avoided. Nordheimer v. Montgomery County, 307 Md. 85, 99, 512 A.2d 379 (1986), and cases there cited.
Second, such broad construction might well render Rule E2 unconstitutional. This Court's authority to "adopt rules and regulations concerning the practice and procedure in and the administration of the ... courts"[4] would not seem to encompass the enactment by rule of the substantive grounds for vacating arbitration awards. Of course, a construction of a provision which does not cast doubt on its constitutionality is preferred. Davis v. State, 294 Md. 370, 377-378, 451 A.2d 107 (1982), and cases there cited.
Finally, the invocation of Rule E2 by this Court has been confined to applying the procedural requirements of the Maryland Uniform Arbitration Act. See Bd. of Ed. of Charles Co. v. Ed. Ass'n, 286 Md. 358, 408 A.2d 89 (1979). See also Brophy v. McLean Trucking Co., 552 F. Supp. 680 (D.Md. 1982). In the only case to come before this Court after the enactment of the Uniform Arbitration Act, involving an arbitration award to which the Act was inapplicable, and involving the substantive grounds for reviewing and vacating an award, the Court made no reference to § 3-224(b) of the Act. Instead, the Maryland authorities cited for the substantive grounds of judicial review were pre-Uniform Act cases. See Amalgamated Transit Union v. MTA, supra, 305 Md. at 389, 504 A.2d 1132.
Rule E2, therefore, is limited to making the procedural provisions of the Maryland Uniform Arbitration Act applicable in judicial proceedings involving arbitration awards to which the Act is otherwise inapplicable.
Consequently, the assumption of the parties and both courts below, that the grounds for vacating an arbitration award set forth in § 3-224(b) governed this case, was erroneous. Rather, the Maryland common law principles for reviewing arbitration awards are controlling.

III.
Arbitration has often been called a "favored" method of dispute resolution. Parr Construction Co. v. Pomer, 217 Md. 539, 543, 144 A.2d 69 (1958); O'Ferrall v. De Luxe Sign Co., 158 Md. 544, 552, 149 A. 290 (1930); Dominion Marble Co. v. Morrow, 130 Md. 255, 260, 100 A. 292 (1917); Lewis v. Burgess, 5 Gill 129, 131 (1847). Consequently, at common law, courts generally deferred to the arbitrator's findings of fact and applications of law. In Burchell v. Marsh, 17 How. 344, 349, 15 L.Ed. 96 (1854), the Supreme Court explained:
"Arbitrators are judges chosen by the parties to decide the matters submitted to them, finally and without appeal. As a mode of settling disputes, it should receive every encouragement from courts of equity. If the award is within the submission, and contains the honest decision of the arbitrators, after a full and fair hearing of the parties, a court of equity will not set it aside for error, either in law or fact. A contrary course would be a substitution of the judgment of the chancellor in place of the judges chosen by the parties, and would make an award the commencement, not the end, of litigation."
Similarly, this Court has generally refused to review arbitration awards on the merits, reasoning that the purpose of arbitration is "to compose disputes in a simple and inexpensive manner" and that extensive judicial review would defeat this purpose. Roberts v. Consumers Can Co., 102 Md. 362, 368-369, 62 A. 585 (1905).
Accordingly, it was firmly established as a common law principle in Maryland that mere errors of law or fact would not ordinarily furnish grounds for a court to vacate or to refuse enforcement of an arbitration award. As this Court stated in Roberts v. Consumers Can Co., supra, 102 Md. at 368-369, 62 A. 585:
"[W]henever the parties to [an arbitration] have had a full and fair hearing the award of the arbitrators, will be expounded favorably and every reasonable intendment made in its support.... In such cases it is conceded that the Court will not look into the merits of the matter and review the findings of law or fact made by the arbitrators nor substitute its opinion or judgment for theirs, but will require the parties to submit to the judgment of the tribunal of their own selection and abide by the award."
See, e.g., Amalgamated Transit Union v. MTA, supra, 305 Md. at 389, 504 A.2d 1132 ("With certain exceptions ..., a court will not review the findings ... of arbitrators"); Chillum v. Button & Goode, 242 Md. 509, 516, 219 A.2d 801 (1966) ("a court will not review the findings of law and fact of the arbitrators"); M. & C.C. v. Allied Contractors, 236 Md. 534, 546, 204 A.2d 546 (1964) ("Mistakes by an arbitrator in drawing incorrect inferences or forming erroneous judgments or conclusions from the facts will not vitiate his award"); Nelley v. Baltimore City, 224 Md. 1, 9, 166 A.2d 234 (1960) (an arbitration award's "`terms are conclusive on the parties,"' quoting 6 Williston, Contracts § 1927 (Rev. ed. 1938); Parr Construction Co. v. Pomer, supra, 217 Md. 543-544, 144 A.2d 69 ("every reasonable intendment supports the validity of the award" and generally the "award will not be set aside for any mistake of law or fact"); Cont. Mill. Co. v. Doughnut Corp., 186 Md. 669, 674-675, 48 A.2d 447 (1946); Dominion Marble Co. v. Morrow, supra, 130 Md. at 260, 100 A. 292; Witz v. Tregallas, 82 Md. 351, 369, 33 A. 718 (1896); Roloson v. Carson, 8 Md. 208, 220-221 (1855); Dorsey v. Jeoffray, 3 H. & McH. 121 (General Court 1793).[5]
Like many other general principles, however, the rule that arbitration awards will not be vacated for errors of law or fact has several exceptions. Thus an award will be vacated for fraud or for misconduct, bias, prejudice, corruption or lack of good faith on the part of the arbitrator. Chillum v. Button & Goode, supra, 242 Md. at 516-518, 219 A.2d 801; M. & C.C. v. Allied Contractors, supra, 236 Md. at 545-547, 204 A.2d 546; Nelley v. Baltimore City, supra, 224 Md. at 9, 14, 166 A.2d 234; Parr Construction Co. v. Pomer, supra, 217 Md. at 543, 144 A.2d 69; Dominion Marble Co. v. Morrow, supra, 130 Md. at 259-260, 100 A. 292; Cromwell v. Owings, 6 H. & J. 10, 13 (1823). Moreover, a mistake by an arbitrator may be "so gross as to evidence misconduct or fraud on his part," Chillum v. Button & Goode, supra, 242 Md. at 517, 219 A.2d 801. See M. & C.C. v. Allied Constractors, supra, 236 Md. at 545, 204 A.2d 546 ("an award is final and conclusive ... in the absence of ... mistake so gross as to imply bad faith or the failure to exercise honest judgment"); Roberts v. Consumers Can Co., supra, 102 Md. at 369, 62 A. 585. In addition, an arbitration award which is contrary to a clear public policy will not be enforced. Amalgamated Transit Union v. MTA, supra.
A court will vacate an arbitration award if it is not within the scope of the issues submitted to arbitration. Chillum v. Button & Goode, supra, 242 Md. at 516, 219 A.2d 801; Cont. Mill. Co. v. Doughnut Corp., supra, 186 Md. at 675-676, 48 A.2d 447; Witz v. Tregallas, supra, 82 Md. at 366-367, 33 A. 718; Cromwell v. Owings, supra, 6 H. & J. at 13-14. An award is also reviewable to determine whether the arbitrator failed to consider all matters submitted. Witz v. Tregallas, supra, 82 Md. at 366-367, 33 A. 718. Furthermore, "a court may modify an arbitration award for a mistake of form such as an evident miscalculation of figures," Chillum, 242 Md. at 517, 219 A.2d 801. And a court will determine whether the parties had a procedurally fair hearing leading to the award. Chillum, 242 Md. at 516, 219 A.2d 801; Nelley v. Baltimore City, supra, 224 Md. at 8, 14, 166 A.2d 234; Cont. Mill. Co. v. Doughnut Corp., supra, 186 Md. at 674, 48 A.2d 447; Roberts v. Consumers Can Co., supra, 102 Md. at 368-369, 62 A. 585; Roloson v. Carson, supra, 8 Md. at 223.
The above-mentioned exceptions to the general rule concerning the finality of arbitration awards are relatively clear-cut. There is, however, an additional limited area of review which is not as clearly defined. This Court has said that "`[t]he favor which the courts accord to awards of arbitrators is however predicated upon the assumption ... that the award ... involves no mistake so gross as to work manifest injustice,'" Dominion Marble Co. v. Morrow, supra, 130 Md. at 260, 100 A. 292, quoting Roberts v. Consumers Can Co., supra, 102 Md. at 369, 62 A. 585. The Court has also stated that an arbitration award will be set aside for a "mistake of law or fact ... appearing on its face," Parr Construction Co. v. Pomer, supra, 217 Md. at 544, 144 A.2d 69. As Chief Judge Chase said for the General Court long ago, "[a] palpable mistake in law or fact, is good cause to set aside an award, if it is apparent on the face of the award." Goldsmith v. Tilly, 1 H. & J. 361, 364 (1802). Accord: Witz v. Tregallas, supra, 82 Md. at 368, 33 A. 718; Ing & Mills v. State, 8 Md. 287, 294, 297 (1855); Tillard v. Fisher, 3 H. & McH. 118, 121 (General Court 1793).
A somewhat similar idea regarding errors of law in arbitration awards was suggested by the Supreme Court in Wilko v. Swan, 346 U.S. 427, 436-437, 74 S.Ct. 182, 187-188, 98 L.Ed. 168 (1953), where the Court observed (emphasis added):
"In unrestricted submissions, ... the interpretations of the law by the arbitrators in contrast to manifest disregard are not subject, in the federal courts, to judicial review for error in interpretation."
While the Supreme Court has not further explained "manifest disregard," other courts have indicated "that manifest disregard of the law must be something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law," San Martine Compania De Navegacion, SA v. Saguenay Terminals, Ltd., 293 F.2d 796, 801 (9th Cir.1961). See, e.g., American Postal Workers Union AFL-CIO v. U.S. Postal Service, 682 F.2d 1280, 1284 (9th Cir.1982), cert. denied, 459 U.S. 1200, 103 S.Ct. 1183, 75 L.Ed.2d 431 (1983); Sobel v. Hertz, Warner & Co., 469 F.2d 1211, 1214 (2d Cir.1972); Saxis Steamship Co. v. Multifacs International Traders, Inc., 375 F.2d 577, 581-582 (2d Cir.1967); Annotation, Vacation of Arbitration Award, 20 A.L.R.Fed. 295, § 9 (1974), and cases there cited.
Moreover, even in cases arising under arbitration statutes delineating the grounds for vacating arbitration awards, courts have indicated that errors which are sufficiently "gross" or are "apparent on the face" or constitute "manifest disregard" justify vacating the awards despite the absence of statutory language literally covering such grounds. For example, by Ch. XXI of the Acts of 1778, §§ VIII and IX, the Maryland General Assembly provided that, when any action was instituted in any court of this State, the court, with the consent of the parties, could refer the matter to arbitration and, after an award, give judgment upon the award. The statute in § IX specified the grounds for setting aside the award, stating that if it "was obtained by fraud or malepractice, in or by surprise, imposition, or deception of the arbitrators, or without due notice to the parties, or their attorney or attornies, it shall and may be lawful for the said court to set aside such award, and refuse to give judgment thereon." With some later modernization in spelling, the statute remained in effect until 1965, ultimately codified as Code (1957), Art. 75, §§ 16-17, and Art. 7, § 5. The 1778 Act was repealed by the statute which enacted the Uniform Arbitration Act, Ch. 231 of the Acts of 1965, § 1. With regard to arbitration awards subject to the 1778 Act, it was very early held that they could be set aside only for "those [reasons] mentioned in the Act of Assembly, or which were apparent on the face of the award." Dorsey v. Jeoffray, supra, 3 H. & McH. at 122 (emphasis added). And in Dominion Marble Co. v. Morrow, supra, 130 Md. at 258, 260, 100 A. 292, a case arising under the statute, the Court indicated that the award could be vacated for a "`mistake so gross as to work manifest injustice....'" See also, e.g., Lutz v. Linthicum, 8 Pet. 165, 178, 8 L.Ed. 904 (1834); Thornton v. Carson, 7 Cranch 596, 3 L.Ed. 451 (1813); Northern Central R.R. Co. v. Canton Co. of Baltimore, 24 Md. 500, 506 (1866); Ing & Mills v. State, supra, 8 Md. at 294, 297; Tillard v. Fisher, supra, 3 H. & McH. at 121.
Similarly, cases under the Federal Arbitration Act have taken the position that awards may be vacated if they reflected a "manifest disregard of the law," although this is not one of the grounds expressly set forth in the Federal Arbitration Act, 9 U.S.C. § 10. See Sheet Metal Workers International Ass'n v. Kinney Air Conditioning Co., 756 F.2d 742, 746 (9th Cir.1985); I/S Stavborg v. National Metal Converters, Inc., 500 F.2d 424, 430 (2d Cir.1974); Sobel v. Hertz, Warner & Co., supra, 469 F.2d at 1214; Saxis Steamship Co. v. Multifacs International Traders, Inc., supra, 375 F.2d at 581-582; Amicizia Societa Navegazione v. Chilean Nitrate and Iodine Sales Corp., 274 F.2d 805, 808 (2d Cir.), cert. denied, 363 U.S. 843, 80 S.Ct. 1612, 4 L.Ed.2d 1727 (1960); United States Steel & Carnegie Pension Fund v. Roy, 637 F. Supp. 995, 997 (S.D.Fla. 1986); Fairchild & Co. v. Richmond F. & P.R. Co., 516 F. Supp. 1305 (D.D.C. 1981); Shearson Hayden Stone, Inc. v. Liang, 493 F. Supp. 104, 108 (N.D.Ill. 1980), aff'd, 653 F.2d 310 (7th Cir.1981); Amoco Overseas Oil Co. v. Astir Navigation Co., Ltd., 490 F. Supp. 32, 37 (S.D.N.Y. 1979); Metal Products Workers Union, Local 1645 v. Torrington Co., 242 F. Supp. 813, 819 (D.Conn. 1965), aff'd, 358 F.2d 103 (2d Cir.1966).[6]
A like situation exists with regard to cases under the Uniform Arbitration Act. Notwithstanding the absence of express language in the Act setting forth such grounds, courts have taken the position that awards may be vacated for "manifest disregard of the law," Southwest Parke Education Association v. Southwest Parke Community School Trustees, 427 N.E.2d 1140, 1147 (Ind. App. 1981), or for "`a manifest mistake of fact or law appearing upon the face of the award,'" Texas West Oil and Gas Corp. v. Fitzgerald, 726 P.2d 1056, 1062 (Wyo. 1986), quoting Riverton Valley Electric Association v. Pacific Power and Light Co., 391 P.2d 489, 500 (Wyo. 1964).[7] The contrary position, however, has also apparently been taken, Alaska State Housing Authority v. Riley Pleas, Inc., 586 P.2d 1244, 1248 (Alaska 1978) (distinguishing between arbitration awards under the Uniform Arbitration Act, which may only be reviewed under the statutory standards, and arbitration awards not subject to the act, which are reviewable under "the gross error standard").
Since, as discussed in Part II of this opinion, the Maryland Uniform Arbitration Act is not applicable to the instant arbitration award, we need not and do not decide whether an arbitration award subject to the Uniform Act may be vacated for an error apparent on the face of the award or for a "mistake so gross as to work manifest injustice" or for "manifest disregard" of the law. Resolution of that issue by this Court must await an appropriate case where the question is presented. Under Maryland common law standards for reviewing arbitration awards, however, we hold that an award is subject to being vacated for a "palpable mistake of law or fact ... apparent on the face of the award" or for a "mistake so gross as to work manifest injustice." As the award in this case is not governed by statutory review criteria, it is subject to these common law standards.

IV.
The award in this case read as follows (emphasis added):
"AWARD
"Based on the evidence, the parties' briefs, and the discussion and analysis set forth above, the undersigned makes the following award:
"1) The Employer did not violate the parties' Agreement when it established a separate and independent entity known as the Driver Education School.
"2) The Driver Education School was not covered by the parties' Agreement and did not violate any provisions of that Agreement when it hired teachers and paid their compensation at other than a rate previously paid by the Board of Education of Prince George's County to teachers employed in the driver education program.
"3) The grievance is denied."
The conclusions that the Driver Education School was a separate and independent entity and that it was a successor employer which hired the teachers and paid their compensation appears on the face of the award. These legal conclusions form the entire basis for the award. If they are palpably and flatly erroneous, as a matter of law, the award should be vacated. The award would, under such circumstance, be erroneous on its face and in manifest disregard of the law.
In order to determine whether the above-quoted conclusions of the arbitrator are manifestly erroneous, it is necessary to consider both the successorship doctrine in labor law and the nature of the employer under the Maryland public education scheme.

A.
The successorship doctrine, a well-recognized principle of labor law, provides that when the employers change, but the bargaining unit remains appropriate, the new or successor employer is bound to recognize and bargain with the union representing a majority of his employees hired from the predecessor employer. NLRB v. Burns International Security Services, Inc., supra, 406 U.S. at 281-282, 92 S.Ct. at 1579. The successor employer is not bound by the substantive terms of a collective bargaining agreement negotiated with the union by the predecessor employer and, instead, is free to negotiate a new agreement. Id. at 287-291, 92 S.Ct. at 1582-1584. Consequently, the successor employer may establish new wages and other terms of employment when initially hiring his work force. Id. at 294, 92 S.Ct. at 1585.
Typically, the successorship doctrine is applied when a new employer purchases or acquires an existing employer, with the old employer abandoning the enterprise and the new employer continuing the business. The doctrine has also been applied to a variety of forms of succession. See, Slicker, A Reconsideration of the Doctrine of Employer Successorship  A Step Toward a Rational Approach, 57 Minn.L.Rev. 1051, 1062-1063 (1973). The leading case giving rise to the successorship doctrine was NLRB v. Burns International Security Services, Inc., supra, 406 U.S. 272, 92 S.Ct. 1571. The criteria upon which the Supreme Court in Burns found a successor employer were that the bargaining unit remained unchanged and that a majority of employees hired by the new employer were represented by a certified union while employed by the predecessor. Id. at 281, 92 S.Ct. at 1579.[8]
The successorship doctrine is related to what are called the "alter ego" and "single employer" doctrines. These three doctrines, taken together, determine the rights and obligations of employers relative to a collective bargaining agreement after a sale, reorganization or any other transformation of an employer. Each of these doctrines imposes different obligations on the old and new employers with respect to the collective bargaining agreement negotiated by the old employer in an attempt to accommodate both the employer's right to make use of his property and the collective bargaining rights of the employees. See, Bartosic & Hartley, Labor Relations Law in the Private Sector, 321-324 (2d ed. 1986); Bargaining Obligations After Corporate Transformations, 54 N.Y.U.L.Rev. 624 (1979).
The "single employer" doctrine treats as one employer the old and new nominally separate employers who have sufficiently integrated their business operations such that they should be treated as a single enterprise for the purposes of enforcing collective bargaining obligations. South Prairie Construction Co. v. Local No. 627, International Union of Operating Engineers, AFL-CIO, 425 U.S. 800, 802-803, 96 S.Ct. 1842, 1843, 48 L.Ed.2d 382 (1976); Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc., 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965). Accordingly, this doctrine would bind both employers to a collective bargaining agreement negotiated by one of the employers. The controlling criteria are "interrelation of operations, common management, centralized control of labor relations and common ownership." Radio & Television Broadcast Technicians, supra, 380 U.S. at 256, 85 S.Ct. at 877. Single employer status is characterized by the lack of "`an arm's length relationship found among unintegrated companies.'" N.L.R.B. v. DMR Corp., 699 F.2d 788, 791 (5th Cir.), cert. denied, 464 U.S. 852, 104 S.Ct. 164, 78 L.Ed.2d 150 (1983).
Unlike the single employer doctrine which imposes obligations on both employers, what has become known as the "alter ego" doctrine holds the new employer responsible for the unfair labor practices and collective bargaining obligations of the old employer. Typically, the alter ego principle applies when an employer, in an attempt to circumvent labor obligations, discontinues operations and creates an entirely new entity to perform the same operations without a substantive change in ownership or management. See Howard Johnson Co. Inc. v. Detroit Local Joint Executive Board, 417 U.S. 249, 259 n. 5, 94 S.Ct. 2236, 2242 n. 5, 41 L.Ed.2d 46 (1974). This doctrine originated in Southport Petroleum Co. v. NLRB, 315 U.S. 100, 62 S.Ct. 452, 86 L.Ed. 718 (1942), where the Supreme Court said (315 U.S. at 106):
"Implicit in the reinstatement provision of the Board's order was a condition of the continued operation by the offending employer of the refinery to the employment of which the illegally discharged employees were to be restored. Such operation might have continued under the old business form or under a disguise intended to evade this provision. If there was merely a change in name or in apparent control there is no reason to grant the petitioner relief from the Board's order of reinstatement; instead there is added ground for compelling obedience. Whether there was a bona fide discontinuance and a true change of ownership  which would terminate the duty of reinstatement created by the Board's order  or merely a disguised continuance of the old employer, does not clearly appear, and accordingly is a question of fact properly to be resolved by the Board on direct resort to it, or by the court if contempt proceedings are instituted."
Based on this language, most courts have held that alter ego status depends upon common ownership and control of the old and new employers. See, e.g., Fugazy Continental Corp. v. N.L.R.B., 725 F.2d 1416, 1419 (D.C. Cir.1984) ("Among the factors that enter into a determination of alter ego status are substantial identity of management, business purpose, operation, equipment, customers, supervision and ownership between the old" and new employers); Goodman Piping Products, Inc. v. N.L.R.B., 741 F.2d 10, 11 (2d Cir.1984). There is no unanimity, however, as to whether alter ego status requires an anti-union animus or other desire to avoid the effects of labor laws on the part of the old employer. See, e.g., N.L.R.B. v. Allcoast Transfer Inc., 780 F.2d 576, 579-582 (6th Cir.1986).
The alter ego and single employer doctrines both attempt to remove form and reveal the substance of the employer. Each of these doctrines treats the old and new employers as a single entity. Under the alter ego doctrine, the old employer has common ownership or control of the new employer, and therefore factually the employers are a single entity. Under the single employer doctrine, two seemingly separate employers are treated as one employer because the facts show a sufficient level of interrelated operations. For these reasons, both of these doctrines bind the new employer to the substantive terms of the agreement negotiated by the old employer.
In contrast, the successorship doctrine does not so bind the employer but only requires that it recognize the union certified to represent the employees of the old employer. The purpose of the successorship doctrine is to protect the employees' expectations when there is a real change of employers. This doctrine also serves to enhance the free flow of commerce by not binding potential new employers to the substantive terms of the old employer's agreement. The successorship doctrine, however, is inapplicable where there is interrelated management or common ownership or control. Under these circumstances, one of the other two principles would apply. Where there is a corporate "spin-off" situation or parent-subsidiary relationship, courts apply the single employer or alter ego rules.[9] We are not aware of any case that has applied the successorship doctrine to hold that a subsidiary corporation is not bound by the collective bargaining agreement between the parent and the union.

B.
In the case before us, the arbitrator did not purport to differ with the labor-law principles set forth above. Instead, he applied the successorship doctrine because of his conclusion that the Driver Education School was a separate and independent entity which replaced the Board as the employer of the driver education teachers.
County boards of education are public corporate bodies created by statute, Code (1978, 1985 Repl.Vol.), §§ 3-103, 3-104 of the Education Article, pursuant to Article VIII of the Maryland Constitution. Educational matters that affect each county are generally under the control of the county board. A county board's purpose is to promote the interests of the schools in its jurisdiction, § 4-101 of the Education Article. As a public corporate body, a county board of education has only those powers expressly delegated to it by the Maryland Constitution or statutes, and those powers impliedly necessary to exercise the express powers. See Urbana Civic Association v. Urbana Mobile Village, Inc., 260 Md. 458, 272 A.2d 628 (1971); Montgomery County Council v. Garrott, 243 Md. 634, 222 A.2d 164 (1966).
The general powers and duties of the county boards of education are set forth in § 4-107 of the Education Article as follows:
"Each county board shall:
(1) To the best of its ability carry out the applicable provisions of this article and the bylaws, rules, regulations, and policies of the State Board;
(2) Maintain throughout its county a reasonably uniform system of public schools that is designed to provide quality education and equal educational opportunity for all children;
(3) Subject to this article and to the applicable bylaws, rules, and regulations of the State Board, determine, with the advice of the county superintendent, the educational policies of the county school system; and
(4) Adopt, codify, and make available to the public bylaws, rules, and regulations not inconsistent with State law, for the conduct and management of the county public schools."
More specific powers of the county boards of education are detailed in various sections of title 4 of the Education Article. These include power to appoint and set the salaries for all principals, teachers and other personnel (§ 4-103); to retain counsel (§ 4-104); to establish schools (§ 4-108); to establish day and evening schools for adults (§ 4-109); to establish curriculum guides and courses of study (§ 4-110); to establish a citizen advisory committee (§ 4-111); to take a census of school children (§ 4-112); to hold in trust for the benefit of the school system property conveyed to the school system (§ 4-113); to acquire, rent, repair, improve or dispose of real property (§ 4-114); to consult with local planning agencies (§ 4-115); to employ architects (§ 4-116); to receive certain types of donations (§ 4-117); to initiate condemnation proceedings (§ 4-118); to consolidate schools (§ 4-119); and to enter joint agreements with certain agencies for the administration of certain programs (§ 4-121).
There can be no doubt that a county board of education could create an internal division to assist in the performance of these powers and duties. Nevertheless, the General Assembly did not give a county board the power to create a separate independent entity to take over functions of the Board. Moreover, the power to create an entity entirely separate from the Board, to perform educational functions, cannot be implied from any provision of state law of which we are aware.
Furthermore, even if a county board of education had the authority to create wholly independent entities for some purposes, no provision of state law has been cited which would authorize a board to divest itself of the function of hiring and paying public school teachers and to vest that function in an independent entity. Absent such legislative authorization, the Board in this case could not divest itself of that basic statutory power and duty. Cf., Maryland Classified Employees Association, Inc. v. Anderson, 281 Md. 496, 508-509, 380 A.2d 1032 (1977); Coddington v. Helbig, 195 Md. 330, 336, 73 A.2d 454 (1950); Larmore v. State, 180 Md. 347, 352, 24 A.2d 284 (1942).
Finally, the General Assembly has made it clear that a county board of education, and no other entity, is the employer for collective bargaining purposes. Section 6-401(d) of the Education Article states:
"(d) Public school employer.  "Public school employer" means a county board of education or the Board of School Commissioners of Baltimore City."
Binding public sector collective bargaining agreements establishing wages, hours or working conditions, must be in accord with the express legislative authorization. Office & Professional Employees International Union v. MTA, 295 Md. 88, 97, 453 A.2d 1191 (1982), and cases there cited. Under the Education Article, the Board of Education of Prince George's County, and only that Board, can be the employer for purposes of collective bargaining contracts with the Association concerning the wages of Prince George's County Public School teachers.
In sum, under Maryland law, the Board necessarily remained the employer of the driver education teachers. There could be no successor employer within the meaning of the successorship doctrine. The so-called Driver Education School, at most, can be nothing more than an administrative division of the Board itself. As a matter of state law, there can be only one employer: the Board.
Therefore the arbitrator in this case made a palpable mistake of law by concluding that the Board and the Driver Education School were separate and independent entities. It was an error apparent on the face of the award. Consequently, the award was not enforceable.
JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY COSTS.
NOTES
[*] SMITH, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.
[1] Prior to 1974, all adult education and after-school teachers were paid at a flat hourly wage. The 1974 collective bargaining agreement provided for a wage scale identical to the one in the 1981 contract. In 1974, in response to an inquiry, the Superintendant of Schools directed that driver education teachers be paid at the hourly rate of 1/1500 of their regular annual salary.
[2] In the Kroll opinion, 29 Md. App. at 408-409, 348 A.2d 870, the Court of Special Appeals had stated as follows:

"We hold that when reviewing the fruits of an arbitrator's award, a judge may withhold only such as were tainted by improbity or based on a completely irrational interpretation of the contract."
We note that in adopting this test, the Court of Special Appeals in Kroll was speaking of a completely irrational interpretation of the contract. The Kroll opinion purported to find, in cases from other jurisdictions, two distinct standards delineating the scope of a court's authority to review an arbitrator's interpretation of the contract. The first was described as the "complete irrationality rule," id. [29 Md. App.] at 409, 348 A.2d 870, and the second as a test which would permit a court to vacate an award if the arbitrator's interpretation of the contract was "arbitrary," id. at 410, 348 A.2d 870. The Kroll opinion viewed the second test as an improper one, as it permitted "review of an interpretation of a contract under arbitration" which would be "beyond our authority." Ibid.
[3] County boards of education are, of course, state agencies and not agencies of the county governments. See, e.g., McCarthy v. Bd. of Education of A.A. Co., 280 Md. 634, 649-650, 374 A.2d 1135 (1977), and cases there cited. See also Hornbeck v. Somerset Co. Bd. of Educ., 295 Md. 597, 620-632, 458 A.2d 758 (1983).

The Maryland version of the Uniform Arbitration Act does not expressly state whether or not its provisions are applicable to disputes arising out of contracts entered into by state agencies. Compare Ariz. Rev. Stat. Ann. § 12-1518 (1982, 1986 Cum.Supp.) (explicitly makes act applicable to state agencies) with Mo. Ann. Stat. § 435.465 (Vernon's, 1987 Cum.Supp.) (uniform arbitration act applies only to contracts formed by "commercial persons" and not to contracts entered into by a governmental agency). With respect to versions of the statute like Maryland's, that contain no express provision whether or not the act is applicable to state agencies, some courts have held that it is applicable. See, e.g., Bd of Educ., South Stickney School Dist. 111 v. Johnson, 21 Ill. App.3d 482, 315 N.E.2d 634, 642 (1974); School City of East Chicago v. East Chicago Fed'n of Teachers, Local # 511, 422 N.E.2d 656, 658 (Ind. App. 1981); Evans Elec. Constr. Co., Inc. v. Univ. of Kan. Medical Center, 230 Kan. 298, 634 P.2d 1079, 1084 (1981); Dept. of Educ. and Cultural Servs. v. Me. State Employees Assoc., 433 A.2d 415 (Me. 1981). The contrary view was expressed in Johnson v. Village of Plymouth, 288 Minn. 300, 180 N.W.2d 184, 186 (1970).
[4] Constitution of Maryland, Art. IV, § 18(a).
[5] A few early cases seemed to distinguish between errors of fact and errors of law in an arbitrator's award, perhaps suggesting a greater willingness to set aside awards for errors of law. See, e.g., State v. Williams, 9 Gill. 172, 175 (1850); Heuitt v. The State, 6 H. & J. 95, 97-98 (1823); Thompson v. Heap & Allen, 2 H. & McH. 477 (General Court 1790). But cf. Goldsmith v. Tilly, 1 H. & J. 361, 364 (General Court 1802). As indicated in the text, the later cases have consistently taken the position that arbitration awards will not normally be vacated for either errors of law or errors of fact.
[6] Some of the cases reason that the "manifest disregard of the law" ground is independent of or in addition to those grounds listed in the Act (e.g., Sheet Metal Workers International Ass'n v. Kinney Air Conditioning Co., supra, 756 F.2d at 746; Office of Supply, Gov. of Rep. of Korea v. New York Nav. Co., Inc., 469 F.2d 377, 379-380 (2d Cir.1972)) whereas other cases adopt the theory that the "exceeded their powers" ground in § 10(d) of the statute encompasses "manifest disregard of the law" (e.g., I/S Stavborg v. National Metal Converters, Inc., supra, 500 F.2d at 430).
[7] See, e.g., Garver v. Ferguson, 76 Ill.2d 1, 27 Ill.Dec. 773, 389 N.E.2d 1181, 1184 (1979) ("gross errors of judgment in law or a gross mistake of fact will not serve to vitiate an award unless these mistakes or errors are apparent upon the face of the award"); Country Mutual Ins. Co. v. National Bank of Decatur, 109 Ill. App.2d 133, 248 N.E.2d 299 (1969) (error of arbitrator in finding cause of action, where "there was no cause of action available," warranted vacating award); Detroit Auto. Inter-Ins. Exchange v. Gavin, 416 Mich. 407, 331 N.W.2d 418, 434 (1982) ("The character or seriousness of an error of law which will invite judicial action to vacate an arbitration award ... must be error so material or so substantial as to have governed the award"); Cournoyer v. American Television and Radio Co., 249 Minn. 577, 83 N.W.2d 409, 412 (1957) ("Mistake which justifies the setting aside of an arbitration award refers to a situation where the arbitrators have not correctly applied their own theory, rule, or formula which they intended to apply"). See also Church Home Foundations, Inc. v. Victorine, Inc., CA No. 6513 (Delaware Court of Chancery, January 27, 1982) (relying on Parr Construction Co., Inc. v. Pomer, 217 Md. 539, 144 A.2d 69 (1958)).

Like the cases under the Federal Arbitration Act, some of the cases under the Uniform Arbitration Act take the view that the statutorily enumerated grounds are not exclusive and that the "manifest disregard" or other ground is independent of the statutory grounds (e.g., Texas West Oil and Gas Corp. v. Fitzgerald, supra, 726 P.2d at 1061-1062), while other cases fit the ground in the statutory category of an award in excess of the arbitrator's powers (e.g., Country Mutual Ins. Co. v. National Bank of Decatur, supra, 248 N.E.2d at 302).
We further note that some of the cases seem to view the extra-statutory ground as extremely limited (e.g., Cournoyer v. American Television and Radio Co., supra, 83 N.W.2d at 412), and other cases view it more broadly (e.g., Detroit Auto. Inter-Ins. Exchange v. Gavin, supra).
[8] The Supreme Court later observed concerning this doctrine that "[t]here is, and can be, no single definition of `successor' which is applicable in every legal context." Howard Johnson Co., Inc. v. Detroit Local Joint Executive Board, 417 U.S. 249, 262-263 n. 9, 94 S.Ct. 2236, 2243 n. 9, 41 L.Ed.2d 46 (1974).
[9] See Penntech Papers, Inc. v. N.L.R.B., 706 F.2d 18 (1st Cir.), cert. denied, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983); Alkire v. N.L.R.B., 716 F.2d 1014, 1021 n. 5 (4th Cir.1983); Sheeran v. American Commercial Lines, Inc., 683 F.2d 970 (6th Cir.1982); Nelson Electric v. N.L.R.B., 638 F.2d 965 (6th Cir.1981); United Telegraph Workers v. N.L.R.B., 571 F.2d 665, 668 (D.C. Cir.), cert. denied, 439 U.S. 827, 99 S.Ct. 101, 58 L.Ed.2d 121 (1978); Royal Typewriter v. N.L.R.B., 533 F.2d 1030 (8th Cir.1976); N.L.R.B. v. Royal Oak Tool & Machine Co., 320 F.2d 77 (6th Cir.1963).