REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1198

September Term, 2013

PRINCE GEORGE'S COUNTY, MD. ON
BEHALF OF PRINCE GEORGE'S
COUNTY POLICE DEPARTMENT

v.

PRINCE GEORGE'S COUNTY POLICE
CIVILIAN EMPLOYEES ASSOCIATION,
ET AL.

Zarnoch,
Wright,
Raker, Irma S.
  (Retired, Specially Assigned),

JJ.

Opinion by Wright, J.

Filed: September 2, 2014

This appeal arises from the Circuit Court for Prince George's County's decision to uphold the opinion and award of an arbitrator in favor of appellee, Prince George's County Police Civilian Employees Association ("PCEA") against appellant, Prince George's County ("County"). PCEA and the County are parties to a negotiated collective bargaining agreement ("CBA") concerning the wages, hours, and other terms and conditions of employment for civilian employees of the Prince George's County Police Department ("Department").

On December 27, 2012, the arbitrator issued an Opinion and Award sustaining a grievance filed by PCEA challenging the County's decision to terminate the employment of Marlon Ford, a civilian employee of the Department whose terms and conditions of employment are covered by the CBA. On the bases of the extensive record adduced during three days of "detailed testimony" from a "dozen witnesses," resulting in a transcript of nearly 1,000 pages, the arbitrator found that the factual record did not support the County's claim that it had "just cause" to terminate Ford's employment.

The County challenged the arbitrator's Order and Award in the circuit court, asserting that the Order and Award should be vacated because the County had met its burden of establishing that this case is within the narrow category of cases in which Maryland Courts may vacate an arbitration award. Specifically, the County claimed that the arbitrator (i) exceeded his authority by independently assessing facts and exercising his own judgment in concluding that the Department lacked "just cause" to terminate

Ford's employment; and (ii) issued an award that is contrary to clear public policy insofar as he found that Ford was entitled to be informed of his right to have a union representative present during an investigatory interview, when his employer was conducting a criminal investigation.

Citing Maryland's well-settled law that a court will not generally disrupt the fair decision of an arbitrator, the circuit court rejected the County's arguments. The County then filed this timely appeal.

The County raises the following issues on appeal, which we have reworded for clarity:[1]

> I. Whether the circuit court erred in failing to vacate the award of the arbitrator when the arbitrator made his own judgments and factual assessments regarding whether the employer had "just cause" to discipline the employee in the context of the CBA?
>
> II. Whether the circuit court erred in failing to vacate the award of the arbitrator when it found it was not a violation of public policy that a governing body may bargain away or compromise the statutory duties of its public safety agency to investigate criminal conduct?

---

[1] The following questions appear verbatim in the County's brief:

> I. Whether the Circuit Court erred in failing to vacate the award of the Arbitrator who exceeded his authority by applying the wrong standard of review in derogation of the essence of the collective bargaining agreement?
>
> II. Whether it is error and a violation of public policy for the Circuit Court to hold that a governing body may bargain away or compromise the statutory duties of its public safety agency to effectively investigate criminal conduct?

2

We answer the first question in the negative and the second question in the affirmative and thus reverse the arbitrator's ruling for the reasons explained below.

**FACTS**

On May 15, 2011, a detective assigned to the Criminal Investigation Division ("CID"), of the Department reported to her supervisor that her firearm was missing and possibly stolen from the ladies' bathroom at the Department's headquarters. An expansive search and investigation was immediately initiated by the officer's fellow CID detectives to search for and retrieve the missing firearm. In the course of conducting the investigation of the missing firearm, Ford, his friend, Khari Grooms, who was in a volunteer position with the Department for individuals with a strong interest in joining the Department, as well as other civilian employees who were in headquarters at or about the time that the officer's firearm went missing, were all asked to return to headquarters to be questioned by CID detectives. During the investigation of Ford and Grooms for the missing firearm, they submitted to a voice stress analysis ("VSA") examination.[2] The

_____

[2] In *Smith v. State*, 31 Md. App. 106, 119 (1976), we explained:

[T]he psychological stress evaluation test is basically a voice lie detector test. The principle underlying this test is that the human voice has many frequencies or a number of sound waves. In addition to the voice that can be heard, there are a series of low frequency (FM) sound waves which are inaudible to the human ear. When a person is under stress or lying, these FM sound waves tend to disappear, due to physiological changes in the body. Conversely, when a person is not under stress or is telling the truth, these FM sound waves are more pronounced. In other words, the absence of FM sound waves indicates the person is lying; the presence of FM sound

3

results of the VSA examination indicated deception on the part of Ford and Grooms with regard to taking or finding the officer's missing firearm.

May 16, 2011, was an off-day for Ford, but he was called by the Department and asked to report to work. Upon his arrival, Ford's supervisor told Ford that she needed to speak to him "real quick" and that it would "only take a minute." Ford was then brought into a room and informed that an officer had misplaced her firearm. Ford was told that, after he provided a statement, he would be on his way. He provided a written statement at about 4:00 p.m.

Instead of being released, Ford was advised of his *Miranda*[3] rights via the Advise of Rights and Waiver Form by Sergeant Tamer of the sexual assault unit and elected to waive his *Miranda* rights and provide a verbal statement. Ford was then interrogated for fourteen hours by twelve to fourteen detectives from the homicide, sexual assault,

---

waves indicates the person is telling the truth.

> In order to conduct this test, the subject is asked certain questions and the answers are recorded on a tape recorder. This tape is reduced in speed and is fed into a psychological stress evaluator, which is similar to an electrocardiogram machine. Based on the reading of the chart from this machine, the examiner determines whether the subject is lying or telling the truth. It has a purported accuracy of 85 percent which is comparable to that of a lie detector.

[3] "Pursuant to *Miranda v. Arizona*, 384 U.S. 436, [479] (1966), an individual in police custody must be warned, prior to any interrogation, that he has the right to remain silent, that anything he says can be used against him in a court of law, and that he has the right to the presence of an attorney, either retained or appointed." *Crosby v. State*, 366 Md. 518, 528 (2001) (citations omitted).

robbery, and child abuse units.

During this part of the investigation, the detectives "screamed" and cursed at Ford, took his cell phone away, and told him that "no one's going anywhere until the gun is found." Ford was told that he was "under arrest," and that he would be spending his birthday in jail. Ford was allowed one meal during the fourteen-hour ordeal, which he was allowed to eat at approximately 4:00 a.m. Ford allowed the Department to search his car and to search a room in his home but asked that he be allowed to alert his sickly grandmother before they searched his home so that she would not be startled when the police arrived. Ford was never given the opportunity to alert his grandmother and both his house and his car were "torn apart" and left in an "atrocious" condition. At no point before or during this interrogation was Ford advised that he had a right to union representation pursuant to Article 8 § C of the CBA between PCEA and the County. [4]

---

[4] Pursuant to the "Agreement Made By and Between Prince George's County, Maryland and The Prince George's County Police Civilian Employees Association: July 1, 2011 through June 30, 2013," Article 8 § C provides:

> When an employee is to be disciplined in a manner which involves a discussion or some other event other than the delivery of the written notice of discipline, or is to be the subject of an investigatory interview or other meeting which may result in discipline, he/she shall be informed in writing at least five (5) working days prior to the start of the interview (1) of the name, rank or title, and command of the officer or supervisor in charge of the investigation, of the officer or supervisor conducting the interview and the nature of the investigation and (2) of his/her right to have present, upon request, a PCEA representative or other person of his/her choice. This time period may be extended by mutual consent of the Employer and the employee. However, if an immediate interview is required and the

Ford was never connected to the missing firearm. However, during Grooms's interview, Grooms stated that on several occasions, he was invited to accompany Ford as he drove around in marked and unmarked police vehicles, "pulled traffic stops," and responded to "calls for service." Grooms also disclosed that he witnessed Ford using the radio as well as activating the emergency equipment such as LED lights and the air horn. Grooms told the CID detectives that Ford represented, on several occasions, that he was a police officer of the Department, and Grooms referred to Ford as "Officer Ford" during the interrogation because he believed that Ford was a member of the Department. Ford, to the contrary, denied ever driving a marked vehicle. Ford did admit, however, that he had activated emergency equipment on one occasion when he used the air horn to attract the attention of a driver who was driving toward him in a reckless fashion. Ford also admitted to unauthorized use of the radio while operating one of the unmarked police vehicles.

On May 17, 2011, following the CID detectives' interrogation of Ford and Grooms, a referral was made to the Internal Affairs Division ("IAD") to initiate an internal investigation with regard to allegations of Ford's misconduct. Ford was at that time notified in writing that he was being placed on administrative leave pending the internal affairs investigation by the IAD investigator pursuant to the relevant provisions

designated PCEA representative is unavailable, the employee may select another PCEA representative who can be present during the investigatory interview.

6

of the CBA.  On July 26, 2011, Ford was notified in writing of his *Weingarten*[5] rights by the IAD investigator.

On July 26, 2011, the IAD investigator produced a report of his investigation disclosing his findings and recommendations.  The report recommended thirteen charges against Ford.  The IAD commanding officer forwarded the report of the investigation to the Office of the Chief of Police with a recommendation that nine of the thirteen charges be sustained and Ford's employment with the Police Department be terminated.  On August 12, 2011, the Chief issued a Notice of Intent of a Proposed Disciplinary Action against Ford for the nine charges sustained against him.

On or about August 26, 2011, PCEA submitted a Response to the Notice of Intent to Terminate Ford to the Chief.  On August 26, 2011, the Chief issued his Notice of Final Disciplinary Action Terminating Ford effective August 29, 2011.  On September 12, 2011, the Union timely issued a grievance letter stating that the disciplinary action against Ford was in violation of Article 8 of the CBA between PCEA and the County.  Among the mutually agreed upon terms and conditions of employment enumerated in the CBA, Article 8 broadly outlines the situations in which the Department may discipline an employee and, in some detail, describes the disciplinary procedures that must be followed.

By its express terms, Article 8 of the CBA directly addresses discipline for

---

[5] *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975), discussed *infra*.

administrative wrongdoing and conduct that constitute a "criminal violation[]" or is "related to an active criminal investigation." For example, Article 8 § I states that the County will not initiate disciplinary action against an employee later than ninety days after the County becomes aware of the alleged infraction, but that this ninety day rule shall not apply where the alleged infractions are either "criminal violations" or are "related to an active criminal investigation."

PCEA and the Department began a series of verbal negotiations to determine whether the Chief would be willing to reconsider Ford's termination. On February 8, 2012, a representative from the Office of the Chief communicated to PCEA that the Chief would not modify Ford's termination.

Article 9 of the CBA sets forth the procedures for filing a grievance "concerning the application or interpretation of the terms" of the CBA "or a claimed violation, misinterpretation or misapplication of the rules or regulations of the Employer affecting the terms and conditions of employment." The contract describes a multi-step grievance procedure, the last step of which is for the parties to submit the matter to an arbitrator, who is authorized to "hear and decide any grievance dispute." With respect to any grievance submitted to an arbitrator, the parties have agreed that "[t]he rules of the American Arbitration Association shall govern the conduct of the arbitration hearing," and that the "decision of the [a]rbitrator shall be final and binding on both parties."

On February 16, 2012, PCEA, on Ford's behalf, invoked its right to pursue a

8

grievance through arbitration. On May 14, 2012, July 31, 2012, and August 1, 2012, both the County and PCEA presented evidence, testimony, and arguments on the merits of the union's grievance before an arbitrator. On December 27, 2012, the arbitrator issued an Opinion and Award sustaining PCEA's grievance and vacating the discipline imposed on Ford, with the exception of a 30-day suspension, finding that the termination of Ford's employment "cannot be supported" on the record adduced at the hearing. The Opinion and Award focused on the County's failure to prove its case, stating:

> Almost every aspect of this case raises unanswered questions or is attended by sharply conflicting testimony . . . . Little purpose would be served by sifting through the many conflicts in the testimony and the written exhibits, most of which would be irreconcilable.

The arbitrator also found that the County violated Article 8 § C insofar as it failed to inform Ford that he was entitled to union representation during the May 16, 2011 interrogation. Nevertheless, the arbitrator found that Ford's conduct was evidence of "bad judgment" and "deserving of discipline." Weighing all of these factors, the arbitrator's Order and Award sustained PCEA's grievance and ordered a "ma[k]e whole" remedy, with the exception of a 30-day suspension.

On January 28, 2013, the County field a Petition to Vacate the Award in the circuit court. On July 11, 2013, the circuit court heard oral argument on the County's Petition to Vacate as well as on a Motion to Confirm the Award filed by PCEA. The circuit court subsequently issued a Memorandum and Order in which it denied the Petition to Vacate and granted PCEA's Petition to Confirm the Award. This appeal followed.

9

**DISCUSSION**

A circuit court's decision to grant or deny a petition to vacate or confirm an arbitration award is akin to an order granting or denying a motion for summary judgment. *See Balt. Teachers Union, Am. Fed'n of Teachers, Local 340, AFL-CIO v. Mayor & City Council of Balt.*, 108 Md. App. 167, 182 (1996); *see also Chillum-Adephi Volunteer Fire Dep't, Inc. v. Button & Goode, Inc.*, 242 Md. 509, 517-18 (1966). The standard of review is *de novo*. *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 14 (2004); *see Jurgensen v. New Phoenix Atl. Condo. Council of Unit Owners,* 380 Md. 106, 113-14 (2004).

Arbitration is favored in the dispute resolution process because "arbitrations are intended to compose disputes in a simple and inexpensive manner, whenever the parties to one have had a full and fair hearing the award of the arbitrators will be expounded favorably, and every reasonable intendment made in its support." *Roberts Bros. v. Consumers' Can Co.*, 102 Md. 362, 368 (1905) (citations omitted); *see, e.g., Bd. of Educ. of Prince George's Cnty. v. Prince George's Cnty. Educators' Ass'n, Inc.* 309 Md. 85, 99 (1987) ("It was firmly established as a common law principle in Maryland that mere errors of law or fact would not ordinarily furnish grounds for a court to vacate or to refuse enforcement of an arbitration award."); *Parr Constr. Co. v. Pomer*, 217 Md. 539, 543 (1958) (noting that although "an award may be open to impeachment for fraud, misconduct, bias, prejudice or mistake, every reasonable intendment supports the validity of the award).

10

Both the Court of Appeals and this Court have repeatedly approved the United States Supreme Court's recitation that arbitrators are "judges chosen by the parties" to hear and decide the issues before them, and that courts will not set aside an arbitration award that represents the honest decision of an arbitrator "after a full and fair" hearing even where there is an error of law or fact:

> Arbitrators are judges chosen by the parties to decide the matters submitted to them, finally and without appeal. As a mode of settled disputes, it should receive every encouragement from a court of equity. If the award is within the submission, and contains the honest decision of the arbitrators, after a full and fair hearing of the parties, a court of equity will not set it aside for error, either in law or fact. A contrary course would be a substitution of the judgment of the chancellor in place of the judges chosen by the parties, and would make an award the commencement, not the end, of the litigation.

*Burchell v. Marsh*, 58 U.S. 344, 349 (1854) (cited in *Balt. Cnty v. Mayor & City Council of Balt.*, 329 Md. 692, 701 (1993)); *Bd. of Educ. of Prince George's Cnty.*, 309 Md. at 98; *Dominion Marble Co., Ltd. v. Morrow*, 130 Md. 255, 293 (1917); *Roberts Bros.*, 102 Md. at 368-69; *Roloson v. Carson*, 8 Md. 208, 221-22 (1855); *Snyder v. Berliner Constr. Co., Inc.*, 79 Md. App. 29, 35 (1989). As the Court of Appeals stated in *Roberts Bros.*:

> It has been settled by a long line of decisions that, as arbitrations are intended to compose disputes in a simple and inexpensive manner, whenever the parties to one have had a full and fair hearing the award of the arbitrators will be expounded favorably, and every reasonable intendment made in its support. In such cases it is conceded that the court will not look into the merits of the matter and review the findings of law or fact made by the arbitrators, nor substitute its opinion or judgment for theirs, but will require the parties to submit to the judgment of the tribunal of their own selection and abide by the award.

102 Md. at 368-69 (internal citations omitted).

11

There are, however, narrow circumstances in which a court may vacate an arbitrator's award.  A court may set aside the judgment of an arbitrator when the party challenging the award is able to demonstrate that the proceedings were tainted by fraud, misconduct, bias, prejudice, corruption, or lack of good faith on the part of the arbitrator. *Bd. of Educ. of Prince George's Cnty*., 309 Md. at 100 (citations omitted).  A court may vacate an award if an arbitrator has made a mistake "so gross as to evidence of misconduct or fraud on his part," *id*., or has "exceeded his authority."  *Bel Pre Med Ctr., Inc. v. Frederick Contractors, Inc*., 21 Md. App. 307, 316 (1974).  Finally, "an arbitration award which is contrary to a clear public policy will not be enforced."  *Bd. of Educ. of Prince George's Cnty.*, 309 Md. at 100 (citing *Amalgamated Transit Union, Div. 1300 v. Mass Transit Admin.*, 305 Md. 380, 389 n.5 (1986)).

### I.    ARBITRATOR'S AUTHORITY

The County contends that the arbitrator exceeded his authority when he overturned the Police Chief's determination that there was just cause to terminate Ford.  The County avers that the role and authority of an arbitrator is derived directly from the provisions of the contract between the parties, and the relevant portions of the CBA do not provide the arbitrator with the "liberty to act as a super personnel officer" or substitute the factual findings of the employer who conducted the initial investigation of the employee's misconduct.  The County further contends that absent specific language as to the standard

12

of review to be applied by an arbitrator during a just cause termination grievance, the arbitrator must apply an "objective reasonable standard" to the evidence to determine whether the employer had just cause to discipline or terminate the employee.

PCEA responds that the circuit court correctly found that the arbitrator did not exceed his authority by evaluating the facts to determine whether the County had just cause to terminate Ford's employment. PCEA contends that the plain language of the CBA gave the arbitrator authority to "hear," "decide," and issue a "final and binding" determination on whether the County had "just cause" to terminate Ford's employment. PCEA also avers that courts have universally interpreted language similar to the CBA to give arbitrators *de novo* authority to review "just cause" disciplinary determinations.

The CBA between the County and the PCEA affords the PCEA the right to bring a grievance "concerning the application or interpretation of the terms of th[e] Agreement or a claimed violation, misinterpretation or misapplication of the rules or regulations of the Employer affecting the terms and conditions of employment." CBA Art. 9 § 9.1. The CBA sets out a multi-step grievance procedure. CBA Art. 9. Within ten days after the event giving rise of the grievance, the employee's PCEA delegate may discuss the grievance with the Division Head and the Division Head will attempt to adjust the matter and respond orally to the employee within two days. CBA Art. 9 § 9.1. If the grievance is not settled through the discussions in Step 1 of the grievance process, a written grievance may be filed, including the specific relief sought, and presented to the Chief of

Police.  CBA Art. 9 § 9.2.  Upon receipt of a written grievance, a meeting will be held within ten days where the Chief of Police meets with the employee, the PCEA President and the employee's PCEA delegate to render a decision in writing no later than ten days after the meeting.  *Id*.  If the grievance is not settled in Step 2, the grievance may be moved to a written appeal, signed by the aggrieved employee and the PCEA President or the employee's PCEA delegate.  *Id*.  The final step is to submit the dispute to an arbitrator who is "appointed to hear and decide [the] grievance" and whose decision "shall be final and binding on both parties."  CBA Art. 9 §§ 9.3(A)(4), 9.3(B).   Thus, as it relates to the County's application of the "just cause" standard contained in Article 8 § A, the role of the arbitrator is to "hear" and make a "final and binding" decision as to whether the employer had "just cause" to discipline an employee.

The County asserts that the arbitrator's role in hearing a grievance over a "just cause" termination is far more limited.  Under the County's theory, the arbitrator's role is "quasi-appellate," or limited to determining whether the County had an "objective[ly] reasonable" basis for making such a decision, without evaluating the facts of the dispute from his "subjective point of view."  We agree with the PCEA that this theory is inconsistent with the CBA.  Again, Article 9 of the CBA provides that when the parties have a "dispute concerning the application or interpretation of terms" of the contract, an arbitrator may be appointed to "hear and decide" the dispute and render an "final and binding" decision.  A clear reading of this language is that the parties have agreed that the

arbitrator had the authority to act in the manner that he did.

The County argues that the "essence" of the relevant provisions can only be interpreted to give the arbitrator the authority to determine whether the County's determination was "objectively reasonable." The County does not explain what it means by an "objectively reasonable" standard–whether it means that an arbitrator should affirm the County's discipline determination if the decision was based on substantial evidence or was not arbitrary and capricious or was not clearly erroneous, or some other standard altogether. The County also fails to cite precedent or support for its position that there is an "objectively reasonable" standard or that the arbitrator should defer in anyway to the County's factual findings.

Of course, the parties could have agreed that an arbitrator's role is to serve some other function. For example, "[i]f the employer wanted the automatic right to discharge an employee for violation of certain company rules or for the commission of certain crimes, . . . it had the opportunity to seek such an explicit exclusion from the general arbitration clause when the collective agreement was negotiated, as it may do when the collective agreement expires." *Amalgamated Transit Union*, 305 Md. at 388 (quoting *Local 453, Int'l Union of Elec., Radio & Machine Workers v. Otis Elevator Co.*, 314 F.2d 25, 28 (2d Cir. 1983)). In the present case, however, the parties agreed that the role of the arbitrator was to make a "final and binding" decision based on the "application or interpretation" or the "just cause" language of the CBA.

15

Further, not only did the parties agree to give the arbitrator "final and binding authority," but they also affirmatively adopted the rules of the American Arbitration Association to "govern the conduct of the arbitration hearing." CBA Art. 9 § 9.3(A)(4). Those rules gave the arbitrator the authority to determine the admissibility, the relevance, and materiality of the evidence offered and to exclude evidence deemed by the arbitrator to be cumulative or irrelevant.[6]

Courts have consistently interpreted similar language to give arbitrators *de novo* authority to review "just cause" disciplinary determinations. The County has not identified a single case in Maryland, or anywhere else, which holds or indicates that the role of a arbitrator in hearing and deciding a grievance is to ask whether the employer's decision was "objectively reasonable" and to defer to the employer's own factual determination. On the contrary, both the Court of Appeals of Maryland and the United States Supreme Court have consistently found that the role of an arbitrator is to make factual determinations based on evidence presented. For example, in *Amalgamated Transit Union*, 305 Md. at 381-34, the Court of Appeals reviewed a challenge to an arbitrator's determination that the MTA terminated an employee's employment without just cause to do so. 305 Md. at 381-84. As is the case here, the parties had a previous agreement establishing that the decision of the arbitrator would be "final and binding."

---

[6] *See* American Arbitration Association Labor Arbitration Rule 27 (available at www.adr.org/labor (last visited July 22, 2014)).

*Id.* at 384. In holding that the arbitrator had the authority to fashion a less severe remedy than the discipline imposed by the MTA, the Court of Appeals explained that an arbitrator has "broad discretion" to fashion an award that is "appropriate to the *facts as found by the arbitrator.*" *Id.* at 390 (emphasis added).

The Court of Appeals's holding in *Amalgamated Transit Union* adopted the reasoning of the Second Circuit in *Local 453, supra*, 314 F.2d 25, which explained the rationale for courts to afford deference to an arbitrator's award. In *Local 453*, the Second Circuit made clear that because the parties "bargained for the decision of the arbitrator" on whether the employee's conduct "constituted 'just cause' for the discharge, the parties are bound by it, even if it be regarded as unwise or wrong on the merits." *Local 453*, 314 F.2d at 28. The basic principle that courts should uphold an arbitrator's opinion has been reaffirmed by Maryland Courts repeatedly. *See, e.g., Balt. Cnty.*, 329 Md. at 701 ("at common law, courts generally deferred to the arbitrator's findings of fact and applications of law"); *Bd. of Educ. of Price George's Cnty*, 309 Md. at 100 (generally, "arbitration awards will not be vacated for errors of . . . fact."); *Balt. Teacher's Union*, 108 Md. App. at 181 (referencing the role of the arbitrator in making "findings of fact"); *Int'l Ass'n of Firefighters, Local 1619 v. Prince George's County*, 74 Md. App. 438, 446-47 (1988).

Citing *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29 (1987) and *Towson Univ. v. Conte*, 384 Md. 68 (2004), the County asserts that its proposed "objectively reasonable" standard is consistent with Federal and Maryland case

law.  In *Misco*, the United States District Court for the Western District of Louisiana vacated the arbitrator's award on grounds that the arbitrator's award was contrary to public policy, and the Court of Appeals for the Fifth Circuit affirmed.  484 U.S. at 34-35. The United States Supreme Court, however, reversed, noting that in response to the employer's alternative argument that the arbitrator made "erroneous findings" of fact, "it is the arbitrator's view of the facts and meaning of the contract" that the parties have agreed to accept, and that "improvident, even silly, factfinding . . . is hardly a sufficient basis" for a court to disregard the decision of an arbitrator "appointed by the parties." *Id*. at 36-39; *see also id.* at 38 ("To resolve disputes about the application of a collective bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them.").  At no point does *Misco* discuss, apply, or define an "objectively reasonable" standard of review.  In fact, *Misco* affirms the arbitrator's role as a fact-finder and reinforces the deference courts should grant an arbitrator's decisions.

The County's reliance on *Towson Univ.* is also misplaced.  In that case, Conte, the Director of Regional Economic Studies Institute for Towson University, sued the University for wrongful discharge and breach of contract requesting a jury trial.  *Towson Univ.*, 384 Md. at 74.  At issue were the terms and conditions of employment– including the "just cause" discipline provision– which were set by an individual employment agreement that did not afford the employee the right to bring the disputes to an arbitrator

18

authorized to make a "final and binding" determination. *Id.* at 74-75. Indeed, although the employment agreement provided Conte with the right to an internal review of the decision, the agreement gave the employer complete "fact-finding prerogative." *Id.* at 82. Therefore, the question presented to the Court of Appeals was "to what extent a *jury* may examine or review the factual bases of an employer's decision to terminate an employee in the absence of an express directive from the employment contract." *Id.* at 71-72 (emphasis added). On those facts and based on those circumstances, the Court of Appeals held that the role of a jury in reviewing an employment contract that provides for "just cause" termination is not "to scrutinize the factual bases for the decision to terminate." *Id.* at 85. Unlike in *Conte*, where the parties mutually agreed that the employer would have the fact-finding prerogative, the case before us does not involve the role of a jury in reviewing an employer's decision; it involves an arbitrator's Order and Award based on an arbitration hearing. Thus, we affirm the circuit court's decision to rely on the wording of the CBA and our precedent, to hold that the arbitrator in the present case did not exceed his authority, and that the arbitrator in the present case applied the correct standard of review.

## II.    PUBLIC POLICY

The County contends that the circuit court's decision that officers in the Department are obligated to inform union members of their *Weingarten* rights while conducting a criminal investigation violates public policy. The County avers that the

19

circuit court's expansion of *Weingarten* interferes with a public agency's statutory duties to detect and investigate criminal conduct.

PCEA responds that the circuit court correctly declined to vacate the arbitrator's Order and Award because it did not constitute a violation of public policy. PCEA contends that there is no well established public policy in Maryland that is contradicted by the arbitrator's Order and Award. PCEA further avers that not only is the Order and Award not contradictory to an established public policy, but it also does not provide any new rights to employees covered by the CBA. Finally, the PCEA contends that the County offers no justification for its claim that the CBA interferes with the Department's duties to effectively investigate criminal conduct.

*Weingarten* rights stem from the United States Supreme Court's decision in *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975), which states that employees must be provided certain procedural protections and the right to have union representation present when they are subject to an investigation or questions that may result in discipline. The *Weingarten* right allows an employee to request the presence of a a union representative, or in some instances a co-worker, at an employer's investigatory interview when the employee reasonably believes that the interview might lead to disciplinary action.[7] *Id.* at

---

[7] "Both non-union employees and union employers may benefit from this right. For example, the presence of a witness elevates the level of concern for fairness [for] both parties and places a non-manager in a position where he or she can provide substantiation during and after the interview. From the employee's point of view, a co-worker witness keeps the employer's nearly unfettered power somewhat in check. And from the

20

267.

A court will not enforce a labor arbitration award if that award is contrary to public policy. *Bd. of Educ. of Prince George's Cnty*, 309 Md. at 100. However, "the public policy which obliges a court to refrain from enforcing a collective bargaining agreement must be 'explicit.'" *Amalgamated Transit Union*, 305 Md. at 389 (quoting *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766 (1983)). The public policy "must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of public interests." *Id*. (citation omitted).

In this case, the arbitrator found that the detectives who questioned Ford about his use of Departmental vehicles and his alleged impersonating of a police officer violated Article 8 § C of the CBA because they did not first provide Ford notice of his rights under that contract provision. In particular, Article 8 § C requires that an employee subject to an investigatory interview that may result in discipline first be informed of his right to have a union representative present during questioning:

> When an employee . . . is to be the subject of an investigatory interview or other meeting which may result in discipline, he/she shall be informed in writing at least five (5) working days prior to the start of the interview . . .

---

employer's point of view, the witness could provide additional information regarding the incident in question and the names of other relevant parties, as well as serve as an employee-level witness to attest to the fairness of the questions asked, the answers given, and the process in general. If discipline is imposed, the co-worker witness may even support the employer's decision when queried by other co-workers in light of his or her first-hand knowledge of the proceedings." Christine Neylon O'Brien, *The NLRB Waffling on Weingarten Rights*, 37 Loy. U. Chi. L.J. 111 (2005) (footnotes omitted).

of his/her choice. This time period may be extended by mutual consent of the Employer and the employee. However, if an immediate interview is required and the designated PCEA representative is unavailable, the employee may select another PCEA representative who can be present during the investigatory interview.

The arbitrator concluded, in what he considered to be a straightforward application of this section, that the County detectives failed to notify Ford about his right to union representation, and that this contract violation was not excused, even though it was in the course of a criminal interrogation of Ford about the missing handgun.

The County contends that the arbitrator's application of Article 8 § C violates public policy by setting a precedent that constitutes an "expanded interpretation" of the CBA and interferes with public safety's statutory duties to detect and investigate criminal conduct. The County contends that this is an issue of first impression in Maryland and relies on two out-of-state cases from New York, *City of New York v. Uniformed Fire Officers Ass'n, Local 854, IAFF, AFL-CIO,* 699 N.Y.S.2d 355 (N.Y. App. Div. 1999), and Illinois, *Ill. State Police v. Fraternal Order of Police Troopers Lodge No.* 41, 751 N.E.2d 1261 (Ill. App. Ct. 2001). The dictates of these cases were rejected by the arbitrator and the circuit court because in both cases, the criminal investigation and the termination of employment involved the same behavior by the employee in question.

We disagree with the circuit court and the arbitrator that the reasoning and rationale of these cases are not applicable to the present case where the subject of the investigation continued to be a criminal act – impersonating an officer– and thus, the

22

County's desire for an expeditious investigation of the criminal matter was still at issue. As in the New York and Illinois cases, cited by the County, we agree that expanding the requirement of *Weingarten* rights to union employees that are the focus of a criminal investigation violates public policy. In *Illinois State Police*, the Illinois Court encountered very similar facts to the matter before this Court. The union in the *Illinois State Police* case submitted several grievances to an arbitrator alleging that the State Police violated the *Weingarten* provisions of the collective bargaining agreement when employees of the police department were subjected to criminal investigation and interrogation by officers of the department's internal investigation division without adhering to the *Weingarten* provisions of the collective bargaining agreement. *Illinois State Police*, 751 N.E.2d 1262-64 (2001). The arbitrator issued an opinion sustaining the grievances and ordering the State Police department to abide by the provisions of the collective bargaining agreement and to provide the union members who were subject to criminal investigations with their *Miranda* rights and their *Weingarten* rights. *Id*. at 1264. The State Police department filed a motion to vacate the arbitration award before the trial court. *Id*. The trial court denied the motion and affirmed the arbitrator's decision. *Id.*

The Illinois State Police Department appealed that decision to the intermediate Appellate Court for Illinois, Fourth District and argued that the arbitrator, *inter alia*, (1) exceeded his authority in ruling that union members could not be interrogated regarding

23

criminal matters unless they were provided with their *Weingarten* rights, (2) ignored the plain language of the contract, and (3) the arbitration award violates public policy. *Id*. at 1265-66. The Appellate Court held that the trial court erred in affirming the arbitration award holding:

> [A]n employer cannot by contract give its employees procedural rights and benefits regarding criminal investigations. The fact that the employer in this case is the Illinois State Police is immaterial. Clearly, when plaintiff is investigating an employees criminal conduct, it is acting under its statutory duty to enforce the laws of the State of Illinois, not as an employer.
>
> Accordingly, we find that the arbitrator exceeded his authority and thus the trial court erred . . . .

*Id*. at 1266 (internal citation omitted).

The Illinois Appellate Court also found that the arbitrator's award requiring compliance with the *Weingarten* provisions of the collective bargaining agreement while the police department conducted criminal investigations violated the public policy of effective law enforcement. *Id*. at 1267. The Illinois Court declared that the public policy of effective law enforcement is demonstrated by the laws of the state. *Id*. at 1266. Furthermore, the Illinois Court determined that requiring compliance with the *Weingarten* provisions of the collective bargaining agreement during a criminal investigation interfered with the police department's ability to investigate crimes. *Id*. at 1267. The Illinois Court also noted that if it required the police to administer *Weingarten* provisions while conducting a criminal investigation, their effectiveness and ability to investigate crimes involving union members would be frustrated. *Id*. Thus, the Illinois Court not

24

only concluded that the arbitrator exceeded his authority, but also concluded that requiring compliance with the *Weingarten* provisions during a criminal investigation violated the public police of effective law enforcement. *Id*.

Similarly, in *City of New York*, 699 N.Y.S. 2d at 360, the Supreme Court of New York, Appellate Division, also determined that *Weingarten* provisions of the collective bargaining agreement do not apply when the employer is conducting a criminal investigation of union members. In *City of New York*, the union brought a grievance and made a demand for arbitration alleging that interviews of its members by the City's Department of Investigations were conducted in violation of the *Weingarten* provisions of the collective bargaining agreement. *Id*. at 356. The City argued that the matter was not arbitrable. *Id*. at 357. The City further argued that in conducting criminal investigations, "the collective bargaining agreement cannot, as a matter of public policy, supplant or impair those procedures; and that public policy considerations prohibit negotiations of the [agency's] criminal investigation procedures." *Id*. The trial court agreed with the City and held that "ensuring governmental integrity is a public policy sufficiently strong as to preclude referral of this dispute to arbitration." *Id*. The Court of Appeals affirmed the ruling of the circuit court and stated:

> The concomitant discretion conferred upon the Department to carry out its mandate would likewise be impermissibly compromised by the restrictions imposed upon its examination of witnesses by the collective bargaining agreement between respondent Uniformed Fire Officers Association and the New York City Fire Department. Because the prerogative of the Department to employ such investigative procedures as it deems appropriate

25

may not be bargained away, there is no reason to submit to arbitration the question of whether the employee rights provisions of the union's collective bargaining agreement are binding upon the [Department of Investigations].

*Id*. at 360.

As in *Illinois State Police* and *City of New York*, the arbitrator's award here and the circuit court's decision to uphold the arbitrator's award constrains the ability of the County's police department to conduct criminal investigations and interrogations of their union members. The arbitrator found that these cases did not apply because "[h]ere, the original investigation (the missing gun) was wholly unrelated to what quickly became the focus of the CID interrogation and the IAD investigation that followed." However, the investigation that followed, while not related to the missing gun, still related to the criminal offense of impersonating an officer.[8] The record indicates that the interrogation shifted from the missing gun to "whether [Ford] had on multiple occasions impersonated a police officer and had driven pool vehicles as if he were an officer on duty, even pulling over speeding cars, using his vehicles horn." While the arbitrator discussed how this indicated that the conversation has shifted from criminal behavior to Ford's behavior as an employee "who, from time to time, drove, refueled and maintained police vehicles," the arbitrator failed to acknowledge that Ford's alleged actions implicated criminal

---

[8] Md. Code (2003, 2011 Repl. Vol.), Public Safety Article § 3-502(b) states:

(b) *Impersonating police officer prohibited*. – A person may not, with fraudulent design on person or property, falsely represent that the person is a police officer, special police officer, sheriff, deputy sheriff, or constable.

26

behavior in the context of impersonating a police officer.

The PCEA contends that Article 8 § C was definitely interpreted in a 2004 arbitration, *In re: Prince George's County and Prince George's County Police Civilian Employee's Association* (Smith, 2004) (herein "*Lanier*"), and thus, the County knew that interrogating an employee about a criminal matter would require *Weingarten* rights. In *Lanier*, the Department interrogated an employee, Lanier, a public safety aide, regarding her criminal interference with a police investigation, without affording Lanier the rights guaranteed to her by Article 8 § C. The Department subsequently terminated her employment and PCEA filed a grievance in which it alleged, among other things, that the Department had violated Article 8 § C when it interviewed Lanier without affording her a right to union representation.

The County, in *Lanier,* denied that it violated Article 8 § C because Lanier was interviewed as part of a criminal investigation. However, the arbitrator noted that "[w]hile a criminal investigation was certainly ongoing, the grievant was also interrogated as an employee," which created additional "pressure [for Lanier] to cooperate." *Lanier*, at 16-17. The arbitrator noted that, "[i]f the grievant had simply been a member of the general public, she would not have been directed to go to Lt. Carney's office, would not have been told to sit on a chair in the hall and stay there, and would not have been directed to stay after her shift ended and continue sitting in a chair." The arbitrator further noted that the Department had conceded that a non-employee citizen in the

27

grievant's position would have had no obligation to speak with the police in those circumstances.

While the PCEA is correct that the decision in *Lanier* preceded the current hearing, this alone is not dispositive of the issue. The arbitrator's reasoning in *Lanier* is not persuasive. The serious crime of theft of a police officer's service weapon and impersonating a police officer cannot give way to an employee's *Weingarten* rights. To do so, as held by our sister jurisdictions, would interfere with the police department's ability to investigate crimes and violate the public policy of effective law enforcement. The public safety exception applies to this case because Ford was being interrogated about several crimes by his police department employer rather than merely an employment issue and we thus reverse the decision of the circuit court affirming the arbitrator's decision. [9]

## III. VACATION AND REMAND

Courts have found that arbitrator awards can be vacated for violating public policy. *See Brown v. Rauscher Pierce Refsnes, Inc.*, 796 F. Supp. 496, 500 (M.D. Fla. 1992) (stating that federal courts have fashioned other grounds for vacating awards in arbitration cases including when the arbitral award violates notions of public policy); *aff'd*, 994 F.2d 775 (11th Cir. 1993); accord *Delta Airlines, Inc. v. Air Line Pilots Assoc.*, 861 F.2d 665 (11th Cir.1988) (stating that the arbitration award violated clearly

---

[9] Our view does not in any way eviscerate the CBA as it still would apply to a myriad of employment issues from insubordination to abuse of leave.

28

established public policy which condemns the operation of passenger airliners by pilots who are under the influence of alcohol).

Md. Code Ann., Cts. & Jud. Proc. § 3-225(a) provides that, "[i]f any award is vacated on grounds other than those stated in § 3-224(b)(5)[10] of this subtitle, the court may order a rehearing before new arbitrators selected by the parties as provided by the agreement, or by the court in absence of an agreement as provided in § 3-211 of this subtitle." *See Downey v. Sharp*, 428 Md. 249, 269 (2012). In *Downey*, the Court of Appeals cited the United States Court of Appeals for the Second Circuit, in a commercial arbitration case, which stated:

> Although judicial review of an arbitration award is very narrowly limited, *Diapulse Corporation of America v. Carba, Ltd.,* 626 F.2d 1108, 1110 (2d Cir.1980), a court should not attempt to enforce an award that is ambiguous or indefinite, *id.* at 1111; *Bell Aerospace Co. v. Local 516, UAW,* 500 F.2d 921, 923 (2d Cir.1974). An ambiguous award should be remanded to the arbitrators so that the court will know exactly what it is being asked to enforce. *Cleveland Paper Handlers and Sheet Straighteners Union No. 11 v. E.W. Scripps Co.,* 681 F.2d 457, 460 (6th Cir.1982) (per curiam); *Oil, Chemical & Atomic Workers International Union, Local 4-367 v. Rohm and*

---

[10] Section 3-224. **Vacating award**.

\* \* \*

(b) *Grounds*. – The courts shall vacate an award if:

\* \* \*

(5) There was no arbitration agreement as described in § 3-206 of this subtitle, the issue was not adversely determined in proceedings under § 302-8 of this subtitle, and the party did not participate in the arbitration hearing without raising the objection.

> *Haas, Texas, Inc.,* 677 F.2d 492, 495 (5th Cir.1982) (per curiam) (Appendix). We believe there is sufficient ambiguity to require a remand in the instant case.

*Downey,* 428 Md. at 268-69 (quoting *Americas Ins. Co. v. Seagull Compania Naviera, S.A.,* 774 F.2d 64, 67 (2d Cir.1985) and citing *Bell Aerospace Company v. Local 516*, 500 F.2d 921, 922, 923 (2d Cir. 1974) ("The employer . . . appeals on the ground that the award was ambiguous and contradictory and should have been remanded for clarification. We find this claim justified and to that extent we reverse and remand.  Courts will not enforce an award that is incomplete, ambiguous, or contradictory"); *Zaninovich v. Teamster Farmworker Local Union 946,* 86 Cal. App.3d 410, 150 Cal. Rptr. 233 (1978) (Case remanded to trial court with directions to vacate an "uncertain" award and order a rehearing by arbitrators); *Federal Signal Corp. v. SLC Technologies,* 743 N.E.2d 1066, 1075 ("[T]he Act specifically gives the court the power to remand an award for clarification")).

In this case, the arbitrator's decision had four components.  The arbitrator did not "believe that the grievant ever acted with the intent that would be required to prove that he should be convicted of the crimes enumerated in the charges against him."  Second, the arbitrator found that the personnel procedures for Prince George's County encourage progressive discipline.  Third, the arbitrator found that those procedures also recommend that mitigating factors are to be taken into consideration, such as the grievant's excellent employment record in the present case.

30

The fourth component to the arbitrator's decision was the *Weingarten* issue. In the arbitrator's final decision, he stated that the New York and Illinois cases were distinguishable from this case because, "[i]n both those cases, the criminal investigation and the termination of employment involved the same behavior by the employee in question. Here, the original investigation (the missing gun) was wholly unrelated to what quickly became the focus of the CID interrogation and the IAD investigation that followed." The arbitrator totally disregarded the criminal nature of the investigation that followed. The arbitrator found that the "failure to offer a Union representative to the grievant once the inquiry became the grievant's behavior as an employee who, from time to time, drove, refueled and maintained police vehicles, [was] a *significant factor weighing in the grievant's favor*. When combined with the other reasons given above, the arbitrator found that the grievant's termination of employment could not be supported.

Although we defer to the arbitrator's reasoning and findings as to the first three portions of his decision, we part company with him as to the fourth portion. As the arbitrator based his final decision to reduce the termination to a thirty (30) day suspension on all four of the enumerated reasons, we cannot eliminate the final reason without making the entire decision and award contradictory.

We, therefore, vacate the arbitrator's decision and award. *See Downey*, 428 Md. at 269. After rehearing, the decision of the new arbitrator will be the final award, subject to

31

the very limited judicial review applicable to arbitration awards generally. *Id.*

                                                **JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY VACATED. CASE IS REMANDED FOR FURTHER PROCEEDINGS PURSUANT TO § 3-225(a) OF THE COURTS AND JUDICIAL PROCEEDINGS ARTICLE. COSTS TO BE PAID BY APPELLEE.**